**Thomas Charles STEVENS, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 15632.**

United States Court of Appeals
Ninth Circuit.

June 4, 1958.

C. J. Hamilton, Coeur d'Alene, Idaho, for appellant.

Ben Peterson, U. S. Atty., Kenneth G. Bergquist, Asst. U. S. Atty., Boise, Idaho, for appellee.

Before BONE, BARNES and HAMLEY, Circuit Judges.

BARNES, Circuit Judge.

Appellant was indicted on a single count for violation of 18 U.S.C. § 2422

(White Slave Traffic Act).[1] The alleged victim was appellant's nineteen year old wife.[2] A trial by jury resulted in appellant's conviction. Motion for a new trial was denied, and this timely appeal follows.

Appellant urges on this appeal as grounds for reversal: (1) The insufficiency of the evidence; (2) error of the trial court in declaring the wife to be a hostile witness; (3) error of the trial court in admitting, over objections of remoteness, testimony that Mrs. Stevens worked as a prostitute near Sacramento, California, in the early part of 1956 and in Miles City, Montana, in 1955; (4) error of the trial court in admitting three government Exhibits—Nos. 4,[3] 9 [4] and 11.[5]

We will discuss the four errors urged together. Because the sufficiency of the

1. Title 18 U.S.C. § 2422: "Coercion or enticement of female.

"Whoever knowingly persuades, induces, entices, or coerces any woman or girl to go from one place to another in interstate or foreign commerce, or in the District of Columbia or in any Territory or Possession of the United States, for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose on the part of such person that such woman or girl shall engage in the practice of prostitution or debauchery, or any other immoral practice, whether with or without her consent, and thereby knowingly causes such woman or girl to go and to be carried or transported as a passenger upon the line or route of any common carrier or carriers in interstate or foreign commerce, or in the District of Columbia or in any Territory or Possession of the United States, shall be fined not more than $5,000 or imprisoned not more than five years, or both. June 25, 1948, c. 645, 62 Stat. 812."

2. Herein referred to as Mrs. Stevens, Mrs. T. C. Stevens, Sharon Stevens; also known as Marjorie Reynolds, Jean Summers, Dianne Summers, Sharon Parsons, Jean Hows, Mrs. Patrick O'Brien, and Jean Stevens. The recital of these aliases is necessary to understand that certain witnesses are describing the one and the same woman.

3. Exhibit 4 was an undated registration card for a Mr. Cromeens at the Davenport Hotel, Spokane, Washington, which showed that he occupied Room 14A. Exhibit 3 was a similar undated registration card, showing Mrs. T. C. Stevens occupied Room 14A. Mrs. Stevens testified she stayed one night at the Davenport on the trip from San Francisco, California to Wallace, Idaho. Exhibits 5 and 6 show that Room 14A was thus occupied on April 9, 1956.

4. Exhibit 9 was purportedly a business card with the writing "Peggy Wallace 1–4041" on the backside. At the trial, Mrs. Stevens said this information was written on the card by one "Vicki", a fellow prostitute working with Mrs. Stevens in Sacramento, California.

The writing gave the name of the lady "who lived at the Oasis," and the telephone number of the Oasis Rooms in Wallace, Idaho, the house of prostitution where Mrs. Stevens admittedly went to practice prostitution on April 10, 1956.

5. Exhibit 11 was the eight pages of original notes (written on both sides made by F.B.I. agent Piefer when he and Agent Gunn interviewed Mrs. Stevens at the Oasis Rooms, Wallace, Idaho on the evening of April 10, 1956. It should be noted that the notes were initialed on each side of each page by Mrs. Stevens (a total of fifteen times) except at the

evidence to convict is challenged, it is necessary to detail some of it.

There was no attempt on the part of anyone connected with this case to deny that Mrs. Stevens had embraced the oldest profession in Miles City, Montana in 1955 and had engaged in it near Sacramento, California early in 1956; in San Francisco, California in late 1955 and early 1956; and in Wallace, Idaho on April 10, 1956. Her voluntary registration with the police department at Wallace, Idaho on April 10th, as a prostitute, was described by a witness, and her registration card with her signature and fingerprints placed in evidence (Exhibit 8). Her prostitution covered a period both before and after her marriage to defendant on October 31, 1955. Mrs. Stevens' knowledge of any work her husband might do was extremely vague. She knew her husband sometimes worked as a cook, and sometimes as a bartender, and sometimes as a gambler. When she admittedly worked as a call-girl in San Francisco, California, he worked as a gambler, but she didn't know where. As a call-girl, she operated through bellboys in various hotels, some of whom testified. In the other places, she admittedly was an inmate of a house of prostitution. Her husband was known to at least some of her associates in both activities.

It is undisputed by the testimony of Mrs. Stevens alone that the defendant husband knew of his wife's profession. He knew of her work at Sacramento. He knew *before* she left for Wallace, Idaho what she proposed to do in Idaho. He drove her to the ticket office to get the ticket. He drove her to the airport to take the plane for Spokane, Washington. At the airport, flight insurance was purchased by one of them, on her life, with the husband as beneficiary. Mrs. Stevens recalled that a woman friend, Kathy M———, gave her a "couple of little sun suits" which Mrs. Stevens, being a confessed prostitute, recognized as "outfits" useful and useable in her profession, and known as "trick clothes." Her husband gave this Kathy a baby stroller, presumably in return for the "outfits." "Kathy" testified to this transaction.

But the statement which Mrs. Stevens allegedly gave to the two F.B.I. agents on April 10, 1956, which was initialed by her and stated to be true and correct, was repudiated by her on the witness stand and not only with respect to those matters which might have implicated her husband. She stated, in fact, "I think there is hardly anything in the statement that is correct. * * * The whole thing is a falsehood." The agents "put words in my mouth. * * * My answers were false." This, despite the fact that at the trial she couldn't "remember what all I talked to them about."

Mrs. Stevens could not remember at the trial whether or not she had told the F.B.I. she had earned $133 for twenty-one "tricks" on her first day at work. Exhibit 15, in her own handwriting and in evidence without objection, constituted her bookkeeping records, showing what she had earned, and showed twenty-one "tricks" by twenty-one entries of money received on April 10, 1956. This admittedly was given by her to the F.B.I. agents, and, on the same kind of stationery upon which she wrote out her earnings, she gave the F.B.I. a receipt for it and for other things (Plaintiff's Exhibit 19).[6] At the

---

end where she wrote, in her own handwriting, the following:

"I have read and initialed 8 pages of notes of Mr. Pieper pertaining to information discussed with me this date. The notes as corrected are true and I have now told the F.B.I. the truth to the best of my knowledge.

"(signed) Sharon Stevens"

Her signature was witnessed by the two F.B.I. agents, Piefer and Gunn.

6. **Exhibit 19:**   "Wallace, Idaho
April 12, 1956

I, Sharon Parsons, freely and voluntarily turn over to agents of the F.B.I. the following items:

1 Letter to T. C. Stevens
1 Letter to Louise P. Creger
1 U.A.L. ticket (used)
1 Lab Statement of Jean Summers
1 Torn up letter
2 Sheets of handwriting

trial, it was only when questions were asked that might have directly implicated her husband, that she became vague about some things and certain about others. She didn't recall making the statement that her husband gave her three $20 bills to buy the ticket to Spokane from San Francisco. She remembered going to the car after buying the ticket, but couldn't remember if she had shown her husband the ticket. She remembered signing the application for insurance and making her husband the beneficiary, but she didn't remember whether her husband paid for it. All of these matters were described in Plaintiff's Exhibit 11. She did remember that her husband had *not* told her to send her earnings to him by money order, contrary to the recital in Exhibit 11. She did remember that she left the house of ill repute near Sacramento and went *alone* to San Francisco, contrary to the recital in the statement that when she wanted to leave the house she telephoned her husband and "he drove up and got me." She remembered that her husband had *not* written "Peggy" and the telephone number "Wallace 1–4041" on the card, at her request, but she didn't know whether she had told the F.B.I. men that he had written it because "I was so mixed up," and "they twisted everything around" and "it's been over a year ago and I can't remember those things."

The witness had written her husband a letter telling him she liked the place, but didn't remember if she told him the amount of money she was making. She may have said that she made $67.50, and that she was on a fifty-fifty split with the Madam.

The court did not arbitrarily declare that Mrs. Stevens was a reluctant and hostile witness. It was only after her testimony as hereinabove outlined in part was given that he was satisfied to grant the government's request that Mrs. Stevens be declared a hostile witness.

Appellant raises the point that a witness cannot be impeached by the side calling him absent a real showing of surprise, and since the government made no attempt to contact this witness before the trial to check whether she would stand by her previous statement, they cannot now claim surprise as the basis for impeachment. The government replies that when it is under obligation to call all material witnesses it can impeach a witness' adverse testimony, and that it had no reason to believe Mrs. Stevens' statement would be different from her prior statements.

■■ The power to permit impeachment of one's own witnesses lies peculiarly and properly within the discretion of trial judges who can closely observe the witness' behavior on the stand.[7] Both Kuhn v. United States, 9 Cir., 1928, 24 F.2d 910, and Sullivan v. United States, 9 Cir., 1928, 28 F.2d 149, are properly cited for the appellant's position, but both are older cases and both involved one of many witnesses necessary for conviction, rather than the sole witness causing the proceeding. The court in those cases recited the commonly accepted rule that a party calling a witness cannot impeach except upon a showing of real surprise. This rule, however, is subject to much criticism in general and, in particular, in the situation where, as here, the government is under an obligation to call the witness. McCormick (Evidence, § 38) criticizes the rule in its entirety and indicates approval of the exception where there is an obligation (such as is on prosecuting officials) to call the witness. This Court has recently indicated approval of the latter exception where the government finds it necessary to impeach its own

---

1 Card writing 'Peggy—Wallace 14041'
1 Card of Geo. Ludomer
1 Sheet listing amounts
1 Card Tri-State Machinery Co.
    (signed)  Sharon Stevens"

**7.** Poliafico v. United States, 6 Cir., 1956, 237 F.2d 97, 108–109; Moomaw v. United States, 5 Cir., 1955, 220 F.2d 589, 592; Di Carlo v. United States, 2 Cir., 1925, 6 F.2d 364, 368.

witness (Meeks v. United States, 9 Cir., 1950, 179 F.2d 319, 321).[8] And although some of the older cases would require the government to investigate prior to trial before claiming surprise, such a rule seems entirely inconsistent with the processes of truth ascertainment (see McCormick, Evidence § 39) and an undue imposition on the government where they reasonably rely on the prior statements as the truth, to which the witness will again testify (Weaver v. United States, 9 Cir., 1954, 216 F.2d 23, 25). Thus we conclude that no error was committed by the trial court in the exercise of its discretion in permitting impeachment of the government's own witness under the circumstances of this particular case.

Being a hostile witness, it was proper to impeach Mrs. Stevens. The best way in which this could be accomplished was by proof of prior inconsistent statements. This made admissible for purposes of impeachment the notes written by one of the F.B.I. agents at the time the conversation with Mrs. Stevens was had, which detailed the conversation.

The objection made to Exhibit 11's admissibility was that it was "incompetent, immaterial, irrelevant, and hearsay as to the defendant." It was competent, it was material, and it was relevant. It was hearsay as to the defendant to the extent it tended to prove the fact of the matter asserted, that is, defendant's conduct with reference to the Wallace trip.[9] It was inadmissible as substantive evidence. But it was admissible to impeach the hostile witness. Weaver v. United States, supra; Meeks v. United States, supra.

No request was made by the defendant to limit the evidence to impeachment only, either when the evidence was received or at the conclusion of the trial. No exception to the court's instructions was taken, and particularly, to the court's general instruction on impeachment. No request for additional instructions was made. Fed.R.Crim.P. 51, 18 U.S.C. No request was made to have the evidence admitted for any limited purpose, or as against any person.

Since the notes were clearly admissible for a limited purpose, we hold the defendant waived error, if any, by failure to object, to except, or to request any limitation. The court's ruling, upon the record in this case, was not plain error. Fed.R.Crim.P. 52.

8. See also Weaver v. United States, 9 Cir., 1954, 216 F.2d 23, 25 citing Gendelman v. United States, 9 Cir., 1951, 191 F.2d 993, 996.

9. There is no question but that the traditional and still accepted rule is that evidence used to impeach is not proper as substantive evidence if it is subject to the hearsay objection. There is a serious disagreement with this traditional rule by both McCormick and Wigmore (McCormick, Evidence § 39; Wigmore, Evidence (3 ed.) § 1018), but both admit that the courts have not yet found themselves able to overcome the traditional objections to hearsay to recognize the fact that in this situation the supposedly dangerous evidence is much more likely the truth and supplies the main requirement of hearsay, that is, the out of court declarant is presently on the stand and thus subject to cross-examination. Both writers feel also that the earlier statement being closer in time to the event and made under circumstances indicating its veracity, is probably better believed in a search for the truth. However, both concede the rule is that such evidence cannot be used substantively. The government here relies on a slight modification of that rule, adopted originally in the Second Circuit (Di Carlo v. United States, supra) and apparently recognized in this circuit (Craig v. United States, 1936, 81 F.2d 816, 828). However, the modification requires some indication in the record that the prior statements be "adopted" by the witness on the stand, in the sense that the record shows the jury could have believed that the witness considered them correct and thereby they became a part of his **present** testimony (see United States v. Block, 2 Cir., 1937, 88 F.2d 618, 620). Whatever the merits of this exception, the record contains such complete denials of the accuracy or veracity of the F.B.I. statements by Mrs. Stevens, that it would seem entirely inapplicable.

■ "The admitted normal rule is that an appellate court will not consider matters which are alleged as error for the first time on appeal, and this is true of criminal as well as civil cases." Smith v. United States, 9 Cir., 1949, 173 F.2d 181, 184; cases cited at note 2.

■ Despite the fact that no such limiting instruction or admonition was sought by defendant's counsel, he now urges that the admission of Exhibit 11 was clearly erroneous, and that there was insufficient evidence, apart from Exhibit 11, to establish defendant's guilt. With this we cannot agree. The defendant's admitted knowledge of his wife's prostitution; his taking her to the ticket office and to the plane (whether or not he bought the ticket and paid for the fare); the testimony of McGovern that he had seen the defendant with Mrs. Stevens when she was working as a call-girl and when he (McGovern) had used her; the testimony of the first Mrs. Stevens that the defendant had suggested to her that prostitution "was a good way to make money," that he had suggested she become a prostitute; that she had refused; that in December 1955 his suggestion that he could place her in prostitution in Miles City, are all persuasive. Most damaging to defendant, in our view, was the testimony of Kathy M——, a prostitute, that the defendant introduced Mrs. Stevens as "his old lady" in a bar; that he was not working then, but was in the bar every day during the daytime; that the defendant requested Kathy to obtain for him some "trick-shorts" his wife could use in prostitution.[10]

10. Testimony of Kathy M——:
"A. Well, I was pregnant at the time and Steve told me that he had a baby stroller and if I wanted it I could have it—and so I said I would. So after he gave me the baby stoller (sic) and just before I had the baby he asked me if I knew where I could find some shorts for him and I had some I didn't want and I told him I would give those to him.
"Q. You say, for him? A. I guess for her.
"Q. You say, 'shorts', what type of shorts specifically was he referring to? A. 'Trick shorts', you know, that they work in them.
"Q. Who works in 'trick shorts', will you tell the Jury who would use them? A. I guess a prostitute would.
"Q. Was Jean, or Mrs. Stevens, present at the time he asked you for that? A. No, she wasn't.
"Q. Did you give him the 'trick shorts'? A. No, he brought her in on the second occasion of my meeting her and she and I, we went to the apartment.
"Q. Was he with you? A. No, he waited for us in the bar.
"Q. Just you and Jean went to the apartment? A. That's right." [Tr. pp. 168–169.]
"Q. Calling your attention to the time the defendant asked you for the 'trick shorts', would you tell the Jury the conversation as you most nearly recall it, Kathy? A. As I recall, he said, 'Do you know where I can get some shorts for Jean? She's going out of town.'. I said that I had some and if he wanted them he could have them. He had given me the stroller and I thought it would be nice to give it to him.
"Q. That is all the conversation as you recall? A. There was probably more, but I don't remember.
"Q. When was the last time you saw Mr. and Mrs. Stevens, Kathy? A. Well, the last time I saw her was when I gave her the shorts, and the last time I saw him was on the tenth of March when he came up to see my baby when I came home from the hospital.
"Q. He was by himself? A. Yes." [Tr. pp. 170–171.]
"Q. And what did you use these 'trick shorts' for? A. I worked in a house of ill repute.
"Q. How long did you work at that? A. I worked in one about three months altogether. I worked in a call house in Los Angeles and a house at Delano, California.
"Q. Now, is it a fact that Mr. Stevens asked you for some shorts for his wife? A. I imagine they were for her.
"Q. He didn't say that they were for his wife? A. He said, 'For Jean'.
"Q. And those shorts—are they the same type of shorts that a woman could wear places other than a place—other than a house of ill repute? A. I wouldn't think so, I have never seen anybody wear them any other place but there." [Tr. p. 172.]

Clearly there was evidence sufficient to go to the jury, entirely apart from the evidence contained in Exhibit 11, and such evidence without the aid of Exhibit 11, was sufficient to entitle the jury to convict the defendant of knowingly persuading, inducing, and enticing his wife into prostitution. With Exhibit 11 in evidence for all purposes the evidence of defendant's guilt was overwhelming.

We need not devote much time to the point that Exhibits 4 and 9 were admitted in error. Mrs. Stevens did not trouble to deny she stayed in Room 14A of the Davenport Hotel in Spokane, Washington, with a Mr. C——— on April 9, 1956. Exhibit 4 may have been cumulative, but it was admissible, and certainly its introduction could not prejudice the defendant. The telephone number of the house of prostitution in Wallace, Idaho and the Madam's name were material to the case, though perhaps not admissible against the defendant until connected up. It was cumulative as to the issue of prostitution as the purpose of Mrs. Stevens' journey. But certainly no prejudicial error occurred by reason of its admission.

We need not devote any greater time to appellant's point three—the remoteness of the prostitution at Sacramento and Miles City. Both were within a year, and closer to six months prior to the acts charged in the indictment. The trial court has wide discretion as to the materiality and relevancy of such matters, and we would not disturb its decision here.

Our discussion hereinabove clearly shows that there was neither error in the introduction of the testimony objected to, nor in declaring the witness Mrs. Stevens a hostile witness, nor in submitting the issue of defendant's guilt to the jury.

The judgment must be, and is affirmed.