**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Hugh C. PRINCE, Defendant-
Appellant.**

**No. 73-2751.**

United States Court of Appeals,
Fifth Circuit.

March 25, 1974.

Samuel Dickens, Baton Rouge, La., George M. Leppert (court-appointed), New Orleans, La., for defendant-appellant.

Douglas M. Gonzales, U. S. Atty., Robert S. Leake, Asst. U. S. Atty., Baton Rouge, La., for plaintiff-appellee.

Before RIVES, GEWIN and RONEY, Circuit Judges.

RIVES, Circuit Judge:

Prince appeals from his conviction, after a trial by jury, for importation of 30 pounds of marijuana in violation of 21 U.S.C. § 952. On appeal he claims four errors: (1) that the marijuana received in evidence without objection was obtained by an illegal search and seizure; (2) that his trial counsel was incompetent and neglectful; (3) that the district judge should have sua sponte directed a verdict of acquittal; (4) that he was denied due process by the prosecutor's misconduct at trial, (a) in departing from his opening statement and (b) in impeaching a government witness in a manner prejudicial to Prince. Finding no reversible error, we affirm.

Customs Agent Gustafson testified that his office had been alerted to the strong possibility that every ten to fourteen days three ships, including the S.S. Baune, were bringing in marijuana from Jamaica to the United States. The S.S. Baune sailed directly from Port Rhodes, Jamaica, to the mouth of the Mississippi River, thence up the Misssippi to Baton Rouge, Louisiana, as its first port of call. There the ship tied up at the dock of the Kaiser Aluminum works on June 9, 1972.

At that time De Peiza was the chief cook aboard the S.S. Baune. Previously De Peiza and Prince worked together as shipmates for about twenty-seven months ending about May of 1969. Since then Prince had been living in Baton Rouge but the two kept in contact with each other.

On the date of Prince's arrest, June 9, 1972, an investigator for the East Baton Rouge Office of the District Attorney and Customs Agent Gustafson conducted a surveillance of the Baton Rouge dock area. They allowed persons to leave the

S.S. Baune on foot without incident,[1] but stopped three taxi cabs within three hundred feet of the Mississippi River. According to the testimony of Customs Agent Gustafson, the River was a national or international boundary.[2]

De Peiza testified that he had acquired the marijuana at the request of one "Mike" whom he had previously met at the Casa Loma Bar in Scotlandville, an area of Baton Rouge, De Peiza left the ship by foot to locate Mike; Mike told him he had only half of the promised $2,000.00 purchase price for the marijuana; De Peiza agreed to see Mike later, allowing him time to raise the balance of the money.

According to De Peiza's testimony, he then went to Prince's home to find whether Prince had contacted his girl friend for him. Prince told him that he had alerted the girl friend. In the course of conversation, De Peiza told Prince about his dealings with Mike. Prince upbraided or "bawled out" De Peiza for taking a chance like that with Mike who was unknown to Prince and had been seen by De Peiza only once before. So far as the record shows no one has seen Mike since he told De Peiza that he did not have enough money to pay for the marijuana.

Prince left his home with De Peiza and boarded the ship with him. There the two had a few drinks in De Peiza's cabin, after which Prince went around to visit with other crew members, his prior shipmates. Later, in his cabin, De Peiza told Prince that it was time to meet Mike and that he had to leave the ship.

Some of the marijuana was in a box marked "Grade A Eggs," some in a blue suit case, and the rest was in a large paper bag encased in a plastic bag. At the gangway Prince took the bag from De Peiza, helped him to shore and helped place the marijuana in the taxicab which had previously been called. The investigator from the District Attorney's office testified that the bag had the "distinctive aroma" of marijuana. According to De Peiza's testimony, Prince knew that he was planning to take the marijuana ashore to Mike at the Casa Loma Bar.[3] Within three hundred feet from the River, government agents stopped the taxicab, searched for and seized the marijuana, and arrested Prince, De Peiza and Couch, a third passenger and later a codefendant who pleaded guilty.[4]

The officers also searched the ship but the only thing of significance found was the sum of $17,000.00 in De Peiza's cabin.

1. Witness Gustafson explained: "These persons were not carrying anything and they were not detained in any way by me." (Tr. p. 53.)

2. "This was construed by me to be a valid border search of a vehicle. The Mississippi River is, for our purposes, considered a national, or an international boundary, and we were within approximately three hundred feet of the international boundary or border when this search occurred, and it was highly probably [sic] that these people were coming directly from the border or from the Mississippi River, this ship having arrived that day from a foreign country." (Tr. p. 59.) The case was tried solely on the theory of importation at this "border."

3. De Peiza testified:
"Q. Now, when he carried that ashore for you, did he know that that was marihuana in there?
"A. I would assume so.

"Q. You assume so. From what do you assume that?
"A. Well, I told him I had it on the ship.
"Q. And he knew that you were going to carry it ashore?
"A. Yes, sir.
"Q. And he knew you were planning to go back to the Casa Loma to find Mike?
"A. Yes, sir.
"Q. And he was there helping you?
"A. Well, he was there, yes, sir.
"Q. Did he help you?
"A. Well, he helped me to the shore." (Tr. p. 28.)
When seized, the bag of marijuana was "directly where he [Prince] was seated, it would be next to his feet on the floorboards, directly in front of him." (Tr. p. 44.)

4. It was stipulated that the substance was marijuana, and that the integrity of the chain of custody was intact. (Tr. pp. 15–16.)

The indictment under which Prince was convicted charged that he "did knowingly and willfully cause to be imported into the United States approximately thirty (30) pounds of marihuana, said substance being contraband in violation of Title 21, United States Code, Section 952."

The pertinent part of Title 21, § 952 provides: "It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance * * *."

The preceding section 951 provides in pertinent part:

"(a) For purposes of this subchapter —

"(1) The term 'import' means, with respect to any article, any bringing in or introduction of such article into any area (whether or not such bringing in or introduction constitutes an importation within the meaning of the tariff laws of the United States)."

Without objection, either at trial or on appeal, the district court instructed the jury that

"* * * * So this says it shall be unlawful to import into the customs territory of the United States from any place outside thereof any controlled substance including marihuana, into the United States.

"Now, when it says, 'into the customs territory of the United States,' customs territory is described as including all of the states of the United States and the District of Columbia and Porto Rico,[5] So it does, of course, include—customs territory does include the state of Louisiana. And

also it is importing it into this country in violation of this chapter, when it is taken off of a vessel in a navigable stream, such as the Mississippi, and brought into the state. That is the introduction into the customs territory of the United States in accordance with the provisions of this act." (Tr. pp. 83–84.)

■ In a case such as this, where the S.S. Baune had sailed directly from Port Rhodes, Jamaica, to Baton Rouge, Louisiana, the instruction was certainly correct. See United States v. Matthews, 5 Cir. 1970, 427 F.2d 992; United States v. Tonarelli, Dist.Ct.Puerto Rico, 1971, 336 F.Supp. 1084, 1085.

The foregoing rather full statement of the facts and description of the theory of importation upon which the case was tried permit an abbreviated discussion of the four claimed errors.

■ 1. There was no objection in the trial court to the admissibility in evidence of the marijuana, nor was there any attack upon the validity of the search for and seizure of that substance. Absent plain error,[6] the issue cannot be originated on appeal.[7]

■ In any event, it is clear that the search was valid. It occurred within 300 feet of the border, within five minutes after the taxi for Prince entered the dock area and moments after it exited the gate marking that area. The search occurred about a year before the decision of Almeida-Sanchez v. United States, 1973, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596. We need not await final settlement of the issue of whether *Almeida-Sanchez* should be applied retroactively. Under the settled law prevailing in this Circuit prior to *Almeida-Sanchez*, this was a valid border

5. We note that 21 U.S.C. § 951(a)(2) provides:
   "(a) For purposes of this subchapter—
   "* * * * *
   "* * * * * *
   "(2) The term 'customs territory of the United States' has the meaning assigned

to such term by general headnote 2 to the Tariff Schedules of the United States."

6. Fed.R.Crim.P. 52(b).

7. United States v. Hall, 5 Cir. 1971, 440 F.2d 1277, 1278.

search.[8] Under the test prescribed by *Almeida-Sanchez,* this search was valid because it was a search of persons departing from a vessel which had sailed directly from Jamaica to Baton Rouge, and thus constituted a search at the border or at its functional equivalent. See 413 U.S. at 272–273.

■■ 2. It was, of course, not incumbent on trial counsel to register a frivolous and unfounded objection to the admissibility of evidence. A careful reading of the record reveals nothing to sustain the charge that trial counsel was incompetent or neglectful.[9]

■ 3. There was no motion for judgment of acquittal. The evidence here was sufficient, indeed ample, to send the case to the jury, and no miscarriage of justice occurred. Under the standard recently restated for this Circuit in United States v. Landers, 5 Cir. 1973, 484 F.2d 93, 94, the district court was under no duty to direct a judgment of acquittal sua sponte.

■ 4. (a) The question of any variance between the proof and the government's opening statement was not raised in the trial court. If it had been raised the matter would have been within the discretion of the district judge. Mares v. United States, 10 Cir. 1968, 409 F.2d 1083, 1085. If there was any such variance, it was slight and does not constitute plain error.

■ (b) Lastly, Prince complains of the introduction of hearsay evidence of a statement attributed to De Peiza immediately after his arrest, to the effect that Prince was supposed to be the buyer of the marijuana. That statement conflicted with De Peiza's testimony that the mysterious Mike was the intended purchaser. The government admits that the prosecutor had talked with De Peiza prior to the trial and that his testimony came as no surprise to the government. We will not here consider whether the long-established rule that a party cannot impeach his own witness is now viable; [10] that rule does not necessarily prevent an exposure of error through prior self-contradiction of some part of his testimony.[11] Indeed, the government was under an affirmative duty not to allow false evidence to go uncorrected.[12] Under all of the circumstances of this case, we hold that it was within the discretion of the district court to permit impeachment of De Peiza's testimony to the extent of admitting in evidence his statement made immediately after his arrest that Prince was supposed to be the buyer of the marijuana.[13]

The judgment is

Affirmed.

8. 19 U.S.C. § 482; United States v. Hill, 5 Cir. 1970, 430 F.2d 129, 131; United States v. Reagor, 5 Cir. 1971, 441 F.2d 252, 254; United States v. Bean, 5 Cir. 1973, 484 F.2d 1275; United States v. Henriquez, 5 Cir. 1973, 483 F.2d 65.

9. See Chambers v. Maroney, 1970, 399 U.S. 42, 53, 90 S.Ct. 1975, 26 L.Ed.2d 419; MacKenna v. Ellis, 5 Cir. 1960, 280 F.2d 592, 599.

10. See Chambers v. Mississippi, 1973, 410 U.S. 284, 295–298, 93 S.Ct. 1038, 35 L.Ed.2d 297; IIIA Wigmore, Evidence (Chadbourn Revision 1970) § 896, et seq. Rule 607 of proposed new Federal Rules of Evidence, H.R. 5463, 93rd Congress: "The credibility of a witness may be attacked by any party, including the party calling him."

11. IIIA Wigmore, *supra,* §§ 902–905.

12. Brady v. Maryland, 1963, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215.

13. See Stevens v. United States, 9 Cir. 1958, 256 F.2d 619, 622; IIIA Wigmore, *supra* n. 10, § 905.