Bill PARKS, Plaintiff-Appellee,

v.

DOWELL DIVISION OF DOW CHEMICAL CORPORATION and Reading and Bates Petroleum Company, Defendants-Appellants.

No. 82–2213.

United States Court of Appeals, Fifth Circuit.

Aug. 15, 1983.

John C. Marshall, Robert M. Roach, Jr., Houston, Tex., for defendants-appellants.

Russell H. McMains, Anthony F. Constant, Corpus Christi, Tex., for plaintiff-appellee.

Before INGRAHAM, WILLIAMS and HIGGINBOTHAM, Circuit Judges.

PER CURIAM:

A vessel owner and an offshore drilling contractor appeal from a money judgment entered after a bench trial finding them jointly and severally liable for injuries suffered by an employee of the well operator from a fire aboard a drilling tender. Reading and Bates Petroleum Company and Dowell Division of Dow Chemical Corp. urge that the judgment is flawed in (1) applying maritime law rather than Louisiana law; and in finding that: (2) Parks was a *Robison* seaman; (3) the tender was unseaworthy; (4) Everett, Dowell's employee, was negligent; (5) Parks was not negligent; (6) an indemnity provision in Parks's contract of employment was void; and finally (7) that the awarded damages are excessive. We affirm.

Bill Parks was injured while working on a drilling tender approximately 110 miles from the shore of Louisiana in the Gulf of Mexico. The drilling tender, the LEO M. CLARK, was owned by Reading and Bates, the drilling contractor, and had equipment on it supplied and operated by Dowell. Dowell had two men aboard primarily to assist in cementing operations. The tender's mission was to assist in the drilling of the well by supplying the means to carry on many of the operations necessary in the drilling, by providing a command center for the operations, by providing storage room for the equipment, and by providing a place for workers to eat and sleep. The well was being drilled from a platform resting on legs affixed to the ocean floor. At the time of the accident the drilling tender was anchored adjacent and was otherwise secured to the platform.

CNG was the well owner and Parks was CNG's "company man" on the job. He was paid by CNG to supervise the drilling operation. He was permanently assigned to the tender where he had his office and performed most of his duties. Parks received daily orders from CNG directing his activity. At the time of the accident Parks had sent test results to CNG and had been told by CNG to re-run a test to determine the oil-gas-water ratio of the well. Parks entered the Dowell room on the tender to direct a pumping operation to equalize the pressure above the ball valve in the well hole. Parks immediately noticed an unusual odor and a gurgling sound which he thought was coming from sour mud used in the pumping operation. Charles Everett, a Dowell employee, commented that the smell and the gurgling was caused by gas and Everett closed a bleed-off valve on the Dowell pump unit. The gurgling immediately stopped. Both men then agreed that escaping gas was the source of the odor and Parks instructed Everett not to smoke in the Dowell room.

The district court found that gas entered the Dowell room through the Dowell line because Everett did not close the bleed-off valve, and either someone aboard the platform opened the valves directly to the well or the valves to the well leaked. Parks had earlier instructed Everett to close the bleed-

off valve at the end of operations when pressure had been removed from the lines. Everett nonetheless "routinely left the bleed-off valve open anyway." Ventilation in the Dowell room was inadequate to remove the gas from the room. After Parks and Everett began the pumping operation, Everett attempted to light a cigarette. The flame from his lighter ignited the gas that had escaped into the room while the bleed-off valve was open and that the ventilation in the Dowell room was inadequate to remove. Parks and Everett were seriously burned from the resulting explosion.

Parks sued CNG, Dowell, and Reading and Bates under general maritime and Jones Act theories, but the Jones Act claim and a claim against another party were dropped shortly before trial. Applying general principles of admiralty law the trial court exonerated CNG but awarded Parks $240,000 for his lost wages, physical damage and pain against Reading and Bates, and Dowell, jointly and severally.

### Maritime Jurisdiction

■ The wrong here occurred in a traditional maritime location and plainly had the requisite relationship to traditional maritime activity. Parks was on the high seas aboard a floating barge-like structure used for transporting and housing men and equipment on and over water. At the time of the accident the tender was anchored by the well site and was moved periodically to avoid particularly rough weather. Its function was to aid the discovery, recovery, and sale of oil and material gas from the sea bottom. We have found such activity to be maritime in character. *Pippen v. Shell Oil Co.,* 661 F.2d 378, 384 (5th Cir.1981). The pumping operation underway when the accident occurred was crucial to the accomplishment of the vessel's maritime mission. There was here a sufficient relationship between the wrong and traditional maritime activity to warrant its exercise. We agree with the trial court's exercise of maritime jurisdiction and reject appellants' contrary suggestion.

### OCSLA

Appellants argue that because the tender was anchored for extended periods adjacent to the platform and was used as its support vessel, it should be considered an extension of the drilling platform. The argument is driven by the rule that when the platform is fixed to the ocean floor a tort occurring aboard the platform is controlled by state rather than federal law. *Rodrique v. Aetna Casualty and Surety Company,* 395 U.S. 352, 353, 89 S.Ct. 1835, 1836, 23 L.Ed.2d 360 (1969). But we are not persuaded that the tender was here such an extension of the platform.

*Rodrique* applies to fixed platform workers and not to the workers on floating vessels that may service these platforms. We elaborated that distinction in *Longmire v. Sea Drilling Corp.,* 610 F.2d 1342, 1348 (5th Cir.1980). In *Longmire* we held that a worker was covered by the OCSLA and not by general admiralty law when he was based principally on the fixed platform and was incidentally assigned to the supporting tender anchored nearby. Nevertheless, we acknowledged that the tender was a vessel and that a claimant who performed a substantial part of his work aboard the tender would be a seaman and not subject to the OCSLA.

The OCSLA, 43 U.S.C.A. § 1333(b)(1), specifically excludes workers qualifying as a "master or member of a crew of a vessel." The term "seaman" and the phrase "master or member of the crew of a vessel" have, as this court has noted on several occasions, come to be used interchangeably. As we noted in *Longmire:*

> The OCSLA covers fixed platform workers, while floating rig workers, even those whose tasks are essentially identical to the tasks performed by fixed platform workers, are treated differently. The reason for the different treatment of fixed and floating rig workers is that floating rigs are treated like vessels while fixed platforms are considered "artificial islands."

610 F.2d at 1348 (footnote omitted). *See also McDermott v. Boudreaux,* 679 F.2d 452

(5th Cir.1982) (Jones Act "seaman" and a "crew member" excluded from the Longshoremen's Act are one and the same).

The *Robison* seaman test is:

■ [whether] the injured workman was assigned permanently to a vessel (including special purpose structures not usually employed as a means of transport by water but designed to float on water) or performed a substantial part of his work on the vessel; and (2) [whether] the capacity in which he was employed or the duties which he performed contributed to the function of the vessel or to the accomplishment of its mission, or to the operation or welfare of the vessel in terms of its maintenance during its movement or during anchorage for its future trips.

*Offshore Company v. Robison,* 266 F.2d 769–79 (5th Cir.1959).

■ Parks meets the *Robison* test. The tender was a vessel designed to float on water. Parks was permanently assigned to the vessel at the time of the accident. He performed almost all of his work on the vessel. He was in charge of insuring that the vessel's missions were accomplished. In fact, he was injured while taking part in and as a result of an operation essential to the mission of the vessel. The trial court correctly found that Parks was a seaman.

### Seaworthiness

■ Applying general maritime law, the trial court found Reading and Bates, as owner of the vessel, liable for Parks's damages under the doctrine of unseaworthiness, by which a vessel owner has an absolute duty to furnish a vessel reasonably fit for its intended purpose. *Smith v. Ithaca Corp.,* 612 F.2d 215, 219 (5th Cir.1980). Appellants attack the trial court's finding that the ventilation on the tender was inadequate to remove the gas from the Dowell room, thereby rendering it unfit for its intended purposes and in part causing Parks's injury.

■ We review the finding of unseaworthiness by the clearly erroneous standard. *Smith v. Ithaca Corp.,* 612 F.2d at

217. Everett admitted that the ventilation in the Dowell room was poor and that the ventilation fans were never running. The several minute lag between the time the leak was sealed off and the time the explosion occurred is evidence of inadequate ventilation. The evidence is thin but it was sufficient to support the trial court's conclusion.

### Everett's Negligence

■ Appellants also urge that the trial court erred in finding that Dowell employee Everett was negligent. Negligence is of course a question of fact measured by the clearly erroneous standard. Parks testified that he had told Everett to close the bleed-off valve, which allowed the gas to enter the Dowell room, after the last pumping operation early that morning. Parks also testified that he and Everett were aware of the gas in the room and had specifically discussed not smoking. He testified that in spite of this conversation Everett attempted to light his cigarette with the lighter at the time of the explosion. Everett himself admitted that he was a two pack a day smoker and was not sure whether or not he had tried to light a cigarette just prior to the explosion.

Q. Just before the explosion, Mr. Everett, did you take a Zippo lighter out of your pocket and reach up and light a cigarette?

A. I don't think so but it's possible.

The trial judge's conclusion that Everett was negligent was not clearly erroneous.

### Parks's Negligence

■ Appellants next attack the finding that Parks was not negligent, urging Parks was negligent because he was smoking in the Dowell room, did not order the bleed-off valve shut, did not open the Dowell room doors, and ordered the well opened too soon. Parks testified, contrary to Everett's testimony, that he was not smoking in the Dowell room, that he ordered Everett to shut the bleed-off valve, that it was not necessary to open the doors to the Dowell room if

normal care was taken and that they had been closed because of rough weather, and that he did not give the instructions to open the well until he got to the Dowell room which was the proper time to do so. In *Oil, Chemical & Atomic Workers v. Ethyl Corp.,* 703 F.2d 933 (5th Cir.1983), we stated: "It is axiomatic that credibility choices and the resolution of conflicting testimony are within the province of the court sitting without a jury, subject only to the clearly erroneous rule of Fed.R.Civ.P. 52(a)." *Id.* at 935. The district court's finding was not clearly erroneous.

### Parks's Contract With CNG

Appellants contend that regardless, Parks is barred from recovery by his employment contract which recited that Parks was an independent contractor and would indemnify and hold harmless CNG and its co-lessees or invitees [which assertedly would include Reading and Bates] for any and all claims demands or suits arising out of the work to be performed under the contract. The contract specifically waived claims based on negligence and unseaworth-iness.[1] There are two major weaknesses with the contract. First, labeling Parks, a man who had no employees, an independent contractor does not make him one. The trial court found that Parks had little of the independence normally accorded an independent contractor:

> He could make no major decisions without consulting a supervisor from CNG, and CNG even controlled the details of his work. CNG provided him with a detailed "prognosis" that outlined the procedures to be followed in the drilling operation. CNG specified the size of pipe, the kind and quality of cement, and the kind of equipment to be used. Mr. Parks received daily instructions from CNG representatives on shore. He made reports to CNG at least twice a day, and if any problems arose, he would communicate with CNG as many as eight times a day. He had no authority to hire or fire. As indicated in the deposition testimony of CNG superintendent of Drilling Operations Jack Malone, the only difference between an employee position and the position occupied by Mr. Parks was the

---

1. *Indemnity*

(a) Contractor shall be responsible and CNG shall never be liable for personal injury to or death of any of Contractor's employees or the employees of Contractor's subcontractors and Contractor agrees to indemnify and hold harmless CNG, any or all co-lessees of CNG who wholly or partially bear the cost of operations hereunder and any or all agents, directors, officers, employees, invitees, or servants of CNG or such co-lessees, against any and all claims, demands or suits (including but not limited to, claims, demands or suits for bodily injury, illness, disease, death or loss of services, property or wages) which may be brought against CNG or against CNG and such co-lessees, whether one or more, or in which CNG or such co-lessees whether one or more, or in which any or all such agents, directors, officers, employees, invitees or servants of CNG or of such co-lessees may be named party defendant or parties defendant, as the case may be, by any employee of Contractor, subcontractor of Contractor, or by an employee of subcontractor of Contractor, or the legal representative or successor of any such employee, in anywise arising out of or incident to the work to be performed under this Contract, irrespective of whether such suits are based on the relationship of master and servant, third party, or otherwise, and even though occasioned, brought about or caused in whole or in part by the negligence of CNG, its agents, directors, officers, employees, servants, invitees, contractors, or subcontractors, or the agents, employees, directors, officers, or servants of said contractors or subcontractors, or by the negligence of the said co-lessees of Owner, their agents, directors, officers, employees, servants, invitees, contractors or subcontractors, or the agents, employees, directors, officers, or servants of said contractors or subcontractors, or by the unseaworthiness or unairworthiness of vessels or craft. By way of illustration, but not by way of limitation, any person who is on contractor's payroll and receives, has received, or is entitled to receive payment from Contractor in connection with the work performed or to be performed hereunder shall be the employee of Contractor, even though CNG reimburses Contractor for the amount paid or to be paid such employee. Contractor further agrees to investigate, handle, respond to, provide defense for, and defend any such claim, demand, or suit at its sole expense, and agrees to bear all other costs and expenses related thereto, even if it is groundless, false, or fraudulent, but Contractor may make such investigation, negotiation, and settlement of any such claim, demand, or suit as it deems expedient.

manner in which the arrangement was structured. (Deposition of Jack Malone, p. 23)

The terms of the "Master Service Agreement" had little connection with the relationship that actually existed between CNG and Mr. Parks. For example, the agreement provided that "contractor" would indemnify CNG against any suit brought against CNG by "contractor's" subcontractors or employees, even though Mr. Parks had no employees, let alone subcontractors.

Second, admiralty courts have refused to enforce agreements in which seamen have relinquished their protective rights absent a clear showing that the agreement is fair and fully compensated. This protective attitude is such that seamen have been considered as akin to wards of the court. Justice Story, sitting on Circuit in 1823, described the "solicitude with which admiralty has traditionally viewed seamen's contracts":

> They are emphatically the wards of the admiralty; and though not technically incapable of entering into a valid contract, they are treated in the same manner as courts of equity are accustomed to treat young heirs, dealing with their expectancies, wards with their guardians and *cestuis que trustent* with their trustees.... If there is any undue inequality in the terms, any disproportion in the bargain, any sacrifice of rights on one side, which are not compensated by extraordinary benefits on the other, the judicial interpretation of the transaction is that the bargain is unjust and unreasonable, that advantage has been taken of the situation of the weaker party, and that pro tanto the bargain ought to be set aside as inequitable.... And on every occasion the court expects to be satisfied, that the compensation for every material alteration is entirely adequate to the diminution of right or privilege on the part of seamen.

*Garrett v. Moore-McCormack Co.,* 317 U.S. 239–46, 247, 63 S.Ct. 246–51, 251, 87 L.Ed. 239 (1942) (quoting *Harden v. Gordon,* Fed. Cas. No. 6047, at pp. 480, 485). As Justice Black later explained in *Garrett,* the burden of proving the validity of a seaman's release is upon the one who sets it up. 317 U.S. at 248, 63 S.Ct. at 252. The trial court did not err in finding that appellants, who were at best third party beneficiaries of the contract, did not carry their burden.

■ The indemnification clause in the contract was never fully and fairly explained to Parks and there is no evidence that he received additional compensation for the relinquishment of his rights as a seaman. The district court's conclusion that the indemnification clause is unenforceable as contrary to public policy was not error.

### Pain and Suffering Award

■ Finally, appellants urge that the $200,000 Parks was awarded for pain and suffering is excessive. The trial court has great latitude in assessing damages. Awards for pain and suffering must necessarily depend to a great extent on the trial court's observations. The determination of the amount needed to achieve full compensation is inescapably at least partly subjective. *Hyde v. Chevron,* 697 F.2d 614 (5th Cir.1983).

■ Parks suffered deep second-degree burns on the entire dorsal surface of both forearms and on part of his back as well as first-degree burns on his face and hands. He was transported by helicopter shortly after the accident from the LEO M. CLARK to Terrebone General Hospital in Houma, Louisiana, where he remained for twelve days. His treatment at the hospital included the administration of medication, the scrubbing away of dead tissue and bathings, and the application of ointment. Upon release from Terrebone, Parks returned to his home in Mississippi, where Dr. Terry E. Westbrook treated him on an outpatient basis prescribing creams and antibiotics and changing his dressings. Parks and his wife also treated the burns in their home and for the first month changed Parks's dressings twice daily. Parks permanently lost all pigmentation in the skin

on his dorsal forearms and the skin is much more susceptible to burns, including sunburn, than normal skin. Parks's forearms cannot tolerate exposure to the sun or caustic agents and he must wear a long-sleeved shirt when in the sun. Much of the scarring was permanent.

Parks's doctor testified that Parks had to have his dressing changed several times a day for several months and that this changing is a painful process. Parks testified that initially his head was so swollen that "you could take the biggest lamp shade in town and couldn't get it on my head." He did not return to work for nearly eight months. While the award seems generous from the distance of our posts, keeping in mind the trial judge's proximity to the case, we affirm.

AFFIRMED.