UNITED STATES of America,
Plaintiff–Appellee,

v.

Antonnio PICKETT, Defendant–
Appellant.

No. 09–30142.

United States Court of Appeals,
Fifth Circuit.

March 2, 2010.

---

Brian Marshall Klebba (argued) and Helen Diane Copes, Asst. U.S. Attys., New Orleans, LA, for U.S.

Robin Elise Schulberg, Asst. Fed. Pub. Def. (argued), New Orleans, LA, for Pickett.

Before CLEMENT, PRADO and ELROD, Circuit Judges.

PER CURIAM:

Defendant Antonnio Pickett pleaded guilty to one count of possession of child pornography. He appeals the district court's denial of his motion to suppress physical evidence and custodial statements. Pickett argues that the warrantless search of his belongings by Immigration and Customs Enforcement ("ICE") agents was not justified by the "border search" exception to the Fourth Amendment. We AFFIRM.

## FACTS AND PROCEEDINGS

The facts of this case are not in dispute. Pickett worked as a commercial diver on the CM15, a pipelay/bury barge which was stationed at an oil and gas

production site thirty miles off the coast of Louisiana in international waters. During the time Pickett was stationed on the CM15, ICE learned that Pickett had subscribed to child pornography websites in December 2006 and January 2007. ICE also discovered that Pickett had an outstanding warrant for domestic violence, and that he would be returning to shore on July 2, 2007. On July 2, Pickett left the CM15 after ending his shift and boarded an offshore supply vessel. He and five other passengers traveled a distance of approximately thirty miles from Main Pass 296 through international waters to the Martin–Mid–Stream Dock in Venice, Louisiana. When he arrived after the three-hour voyage, a team of two ICE agents, four customs agents, and two Plaquemines Parish Sheriff's deputies encountered Pickett when he docked in Venice. ICE agents detained him and conducted a "secondary customs inspection" of Pickett and the five other crew boat passengers. The agents relied on the border search exception to view the contents of Pickett's thumb drives, portable hard drives, and laptop memory card. No warrant was obtained for the search, which revealed several images of child pornography. Following the search, Pickett waived his *Miranda* rights and admitted to accessing and downloading the illegal pornographic images. Thereafter, agents obtained a warrant for a more intrusive search and eventually found several hundred illegal images and videos.

Before the district court, Pickett moved to suppress the child pornography images found during the search at the Venice dock, along with any statements he made to law enforcement officers on that date. He also sought to suppress, as fruits of an "illegal warrantless search," those materials revealed in the subsequent search which was conducted pursuant to a warrant. Pickett claimed that he was entitled

to have these materials suppressed because ICE agents did not obtain a warrant for the July 2 search. He disputed the Government's argument that the warrantless search was justified under the "border search exception," as articulated in *United States v. Stone*, 659 F.2d 569 (5th Cir. 1981). He argued that the border search exception to the Fourth Amendment did not apply to the agents' search of his possessions on the theory that his voyage to shore involved "no border crossing," because it allegedly originated from a "federal enclave." Pickett contends that the CM15 was a "federal enclave" under the Outer Continental Shelf Lands Act ("OCS-LA"), which extends adjacent state law as adopted federal law to the "subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon." 43 U.S.C. § 1333(a)(2)(A). Without deciding whether the CM15 was an OCSLA situs, and therefore a federal enclave, the district court denied the motion. The court reasoned that the border search exception applied because Pickett was "outside the country, headed in," and he crossed the border "from international waters." Preserving his right to appeal the denial of his motion to suppress, Pickett pled guilty to one count of possession of child pornography. He was sentenced to 87 months' imprisonment.

## STANDARD OF REVIEW

"In an appeal of a denial of a motion to suppress evidence, 'we review the district court's factual findings for clear error and its legal conclusions, including its ultimate conclusion as to the constitutionality of the law enforcement action, de novo.'" *United States v. Harris*, 566 F.3d 422, 433 (5th Cir.2009) (quoting *United States v. Chavez*, 281 F.3d 479, 483 (5th Cir.2002)). We view the evidence presented at the suppression hearing in

the "light most favorable to the prevailing party." *Id.*

## DISCUSSION

██ The Fourth Amendment provides that "[t]he right of the people to be secure in their persons ... and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. "[W]arrantless searches and seizures are unreasonable per se unless they fall within a few narrowly defined exceptions." *United States v. Rivas*, 157 F.3d 364, 367 (5th Cir.1998). The border search is one such exception, and it has a "history as old as the fourth amendment itself." *United States v. Ramsey*, 431 U.S. 606, 619, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). The border search exception permits a government officer at an international border to conduct a "routine" search and seizure, "without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) (citation omitted).[1] "A border search need not take place at the actual border." *United States v. Stone*, 659 F.2d 569, 572 (5th Cir.1981). The search may take place at " 'the functional equivalent of the border,' " such as the port where a ship docks in this country after entering our territorial waters from abroad." *Id.* (quoting *United States v. Prince*, 491 F.2d 655 (5th Cir. 1974)).

██ Pickett argues that because ICE agents knew he was returning to shore from a "federal enclave," the border search exception was inapplicable to the search of his belongings at the dock. We reject this argument as foreclosed by our decision in *Stone*. 659 F.2d 569. In *Stone*, we held that the "critical fact" we must look to in determining whether the border search exception applies is "whether or not a border crossing has occurred,"—not the point of origin of the defendant's journey.[2] 659 F.2d at 573. *Stone* involved a border search of a small aircraft, which was intercepted flying low from international airspace toward Florida. When the plane landed at Orlando International Airport, agents conducted a warrantless border search that revealed several hundred pounds of narcotics. *Id.* at 571. The defendant moved to suppress the evidence on the ground that the border exception did not apply because the Government had failed to "demonstrate not only that a border has been crossed but, additionally, that the entering craft has left foreign land." *Id.* We rejected the defendant's argument as "tenable neither in law or logic," recognizing that "in no case has a border search been invalidated because the object's departure from foreign soil was not demonstrated." *Id.* at 573. In so holding, we affirmed that the applicability of the border search exception "rests on the 'critical fact' of *whether or not a border crossing has occurred.*" *Id.* at 573 (quoting *Ramsey*, 431 U.S. at 620, 97 S.Ct. 1972 (emphasis added)).

Pickett has failed to distinguish the instant case from *Stone*. He argues that

---

**1.** Pickett never disputed whether the search of his laptop and external hard drives was "routine."

**2.** In *Stone*, the district court rejected the argument that the border search exception applied, though it upheld the motion to suppress on the ground that "the existence of probable cause and exigent circumstances rendered the search fully reasonable under the [F]ourth [A]mendment." 659 F.2d at 570. We affirmed on different grounds, for the reasons stated above.

*Stone* does not control because here, unlike in *Stone*, the Government *knew* that the defendant was traveling to the United States from a federal enclave. This distinction is immaterial. *Stone* holds that defendant's point of origin is irrelevant to the constitutionality of a border search so long as a border crossing has occurred. As such, the government's knowledge of that point of origin is equally irrelevant. We likewise reject Pickett's argument that no "border crossing" occurs where a defendant enters the United States after crossing international waters if he departs from a domestic point of origin. Our precedent establishes that a border crossing occurs whenever a vessel crosses from international waters into the United States, regardless of the defendant's departure point.[3]

■ Even assuming, *arguendo*, that the CM15 was an OCSLA situs and Pickett did depart from a federal enclave,[4] there is no doubt that the border search was proper because Pickett crossed the border *from "international waters"* en route to the dock in Louisiana. Pickett suggests we consider his voyage akin to a flight over international waters between known domestic points of origin—a situation which a sister circuit has suggested merits different treatment under the Fourth Amendment due to the substantially diminished likelihood of bringing aboard contraband mid-journey while on an airplane.[5] This comparison is spurious, as Pickett traveled by boat on his three-hour voyage to shore, and it is not difficult to imagine picking up contraband while crossing open waters. We therefore conclude that the border search of Pickett's belongings was justified where it is undisputed that he entered the United States by boat from international waters.

## CONCLUSION

The judgment of the district court is AFFIRMED.

EDITH BROWN CLEMENT, Circuit Judge, concurring in the judgment only:

Pickett's sole argument on appeal is that there was no "border crossing" within the meaning of *Stone* because he moved to shore from a federal enclave as defined in OCSLA and government agents were aware that he had not made an intervening stop in a foreign country. Confronting this argument requires, as a first step, that we determine whether CM15 is an OCSLA

---

3. *See Stone,* 659 F.2d at 573 (noting that customs officers could, "with complete impunity," search and inspect such objects as "fishing vessels, which, although they have not departed from foreign territory, have crossed the border.").

4. We do not decide whether the CM15 is actually a "federal enclave" for the purposes of 43 U.S.C. § 1333(2)(a), because the characterization of the defendant's point of origin—whether foreign or domestic—is irrelevant to the applicability of the border search exception when the defendant enters the United States from international waters. *Stone,* 659 F.2d at 573.

5. *See United States v. Garcia,* 672 F.2d 1349, 1357–58 (11th Cir.1982) (noting, in a case interpreting *Stone,* that the court "would not be prepared to uphold ... a search of an aircraft whose known points of origin and landing were within the United States simply by virtue of the fact that the plane had passed over international waters" since unlike boats, planes were unlikely to rendezvous with contraband en route). The case before us presents no cause to examine any purported distinctions between air and sea travel for purposes of the Fourth Amendment, and we express no opinion on the matter. We also find inapposite Pickett's cited cases interpreting the federal drug importation statute, 21 U.S.C. § 952(a). These cases concern matters of statutory interpretation, and their holdings are not material to our Fourth Amendment analysis.

situs and thus a federal enclave in international waters. Applying longstanding Fifth Circuit precedents, I would hold that CM15 is not an OCSLA situs and affirm the district court on this ground, without reaching the question whether we may consider point of origin in Fourth Amendment border search cases.

Our cases have recognized a basic distinction regarding the application of OCSLA: for a rig or platform to be a federal enclave in international waters, it must be "erected" upon the Outer Continental Shelf ("OCS"); OCSLA does not apply to vessels that float on the water. *See* 43 U.S.C. § 1333(a)(1) (noting that OCSLA does not apply to "a ship or vessel"). In *Longmire v. Sea Drilling Corp.*, we stated that

> OCSLA covers fixed platform workers, while floating rig workers, even those whose tasks are essentially identical to the tasks performed by fixed platform workers, are treated differently. The reason for the different treatment of fixed and floating rig workers is that floating rigs are treated like vessels while fixed platforms are considered "artificial islands."

610 F.2d 1342, 1348 (5th Cir.1980) (footnote omitted). Likewise, in *Parks v. Dowell Division of Dow Chemical Corp.*, we held that OCSLA did not govern the claim of a worker who performed a substantial part of his work aboard "a floating barge-like structure used for transporting and housing men and equipment on and over water," even when the vessel was attached to a fixed platform. 712 F.2d 154, 157 (5th Cir.1983). As we noted in that case, OCSLA does not apply to "vessel[s] designed to float on water." *Id.* at 158. This distinction between floating rigs and fixed rigs also drove our opinion in *Demette v. Falcon Drilling Co., Inc.*, where we held that a jack-up rig is erected within the

meaning of OCSLA when the rig is jacked up and its legs are resting upon the OCS, even temporarily. 280 F.3d 492, 498 (5th Cir.2002), *overruled on other grounds, Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir.2009). In that case, we also noted that "[a]lthough arguably an anchor 'attache[s]' a ship to the seabed, a tender, unlike a jack-up rig, is not 'erected' on the OCS." *Id.* at 500 n. 28 (second alteration in original). *See also Becker v. Tidewater, Inc.*, 581 F.3d 256, 264–66 (5th Cir.2009) (applying *Demette*).

CM15 is not a fixed platform. Nor is it a jack-up rig. As was undisputed at the evidentiary hearing, it is a 220–foot barge, powered by a tug boat, that moves from point to point on the open seas as frequently as every thirty minutes. When it is working, the vessel drops eight large anchors to stabilize its position but is not erected on the OCS within the meaning of *Demette*. In this sense, it is indistinguishable from the floating barges at issue in both *Longmire* and *Parks*. CM15 also fits squarely within the maritime law definition of "vessel" as a "watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. The fact that CM15 is not a traditional boat, or that it does not power itself, is irrelevant. Courts have defined a number of non-traditional craft as "vessels." *See, e.g., Stewart v. Dutra Const. Co.*, 543 U.S. 481, 125 S.Ct. 1118, 160 L.Ed.2d 932 (2005) (floating dredge with limited means of self-propulsion); *Holmes v. Atlantic Sounding Co., Inc.*, 437 F.3d 441, 448–49 (5th Cir.2006) (housing barge incapable of self-propulsion); *Bunch v. Canton Marine Towing Co., Inc.*, 419 F.3d 868, 873–74 (8th Cir.2005) (cleaning barge attached to the river bed by poles); *Burks v. Am. River Transp. Co.*, 679 F.2d 69, 75 (5th Cir.1982) (drilling barge and submerged barge in use as a drilling platform); *Marine Drilling Co. v. Autin*, 363

F.2d 579 (5th Cir.1966) (not reversing jury finding that a submersible drilling barge "stabilized in navigable water" was a vessel); *Producers Drilling Co. v. Gray*, 361 F.2d 432, 433 (5th Cir.1966) (submersible drilling barge "resting on the bottom of a canal"); *Kibadeaux v. Standard Dredging Co.*, 81 F.2d 670, 673–74 (5th Cir.1936), *cert. denied*, 299 U.S. 549, 57 S.Ct. 12, 81 L.Ed. 404 (1936) (floating dredge without self-propulsion connected to shore by pontoons).

Pickett cites to *Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043 (5th Cir.1990) and to *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 543 F.3d 256 (5th Cir.2008), *rev'd en banc*, 589 F.3d 778 (5th Cir.2009), in support of his argument that CM15 is an OCSLA situs.[1] These cases do not support Pickett's position. In both cases, the court was attempting to determine whether the OCSLA situs requirement was met where the claims arose from contractual agreements. In this criminal appeal, however, there is no dispute that the relevant location for determining whether Pickett departed from an OCSLA situs is CM15.

CM15 is not an OCSLA situs and it was working within international waters. When Pickett moved from CM15 to shore, he moved from international waters into United States territorial waters, crossing the United States border as he did so. This movement is indistinguishable from that in *Stone*, in which the defendant moved from international airspace to domestic airspace and was stopped and searched at the functional equivalent of the border.

The per curiam opinion holds that Pickett crossed the border within the meaning of *Stone* regardless of whether he departed from a federal enclave, concluding that the point of origin preceding a border crossing makes no difference in the constitutional analysis. This is an issue of first impression in this circuit and it is not an easy one. Two circuits have considered a similar question and have concluded that point of origin *does* matter in determining whether there has been a border crossing for purposes of the drug importation statute. *See United States v. Cabaccang*, 332 F.3d 622, 626–27 (9th Cir.2003) (en banc) (rejecting contention that drugs shipped by air from California to Guam were imported from "place outside" United States because they moved through international airspace); *United States v. Ramirez–Ferrer*, 82 F.3d 1131, 1135 (1st Cir.1996) (en banc) (rejecting contention that statute is applicable to movement from international waters to domestic waters "without regard to the 'place' from which the shipment actually originated"); *see also United States v. Garcia*, 672 F.2d 1349, 1357 (11th Cir.1982) (casting doubt on assertion that "point of origin has no bearing on the reasonableness of a search so long as a border crossing has been established"). The per curiam opinion's holding is not only unnecessary, but creates a circuit split.[2] The defendant's argument on ap-

1. The en banc opinion in *Grand Isle* had not been issued at the time Pickett filed his briefs. The en banc court affirmed the district court, which the panel had reversed. Regardless, *Grand Isle* was never applicable to Pickett's case because it dealt with how to determine situs in cases arising out of contract claims.

2. The per curiam opinion attempts to reserve the question whether there is a distinction to be made between crossing the border by boat

and crossing it by plane. But a fair reading of the per curiam opinion is that under *Stone*, because point of origin is not relevant to whether a border crossing has occurred, ICE agents can indeed conduct warrantless searches of passengers on a flight that takes off in Miami, crosses into international airspace over the Gulf of Mexico, and lands in Houston. Regardless of whether the court were to accept such a premise—one that

peal rests on the assertion that CM15 is an OCSLA situs. That assertion is untenable. The doctrine of constitutional avoidance suggests that we should decide the case on the well-traversed ground of our OCSLA precedents, and leave the difficult constitutional question for another day when it is squarely before us.

three circuits have cast serious doubt upon—I believe that the facts of this case do not require us to reach this question, especially given the cursory briefing before us.

Stone certainly does not compel this conclusion. There is language in Stone suggesting that the border search exception is broad enough to apply to movement from a domestic site through international space and across the border. This language is dicta. The issue in Stone was whether the border search exception applied in a case where the point of origin was unclear. 659 F.2d at 573. The court held that it did. In this case, the point of origin is clearly foreign territory, because CM15 is not an OCSLA situs. There is no reason to expand the holding of Stone, and especially to venture into unsure constitutional waters, when Stone already suffices to decide this case.