Revised January 31, 2002

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-30165

_____

KERMIT DEMETTE,

                                        Plaintiff,

                        versus

FALCON DRILLING COMPANY, INC.; ET AL.,

                                        Defendants.

R & B FALCON DRILLING USA, INC.,

                                        Defendant-Third Party
                                        Plaintiff-Appellee,

                        versus

FRANK'S CASING CREW & RENTAL TOOLS, INC.,

                                        Third Party Defendant-
                                        Appellant.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana

_____

January 16, 2002

Before HIGGINBOTHAM and DeMOSS, Circuit Judges, and FISH,[*] District
Judge.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

_____

    [*] District Judge of the Northern District of Texas, sitting by
designation.

Without prejudice to the Petition for Rehearing *En Banc* of Third Party Defendant-Appellant Franks Casing Crew & Rental Tools, Inc., we substitute the revised opinions that follow in place of the prior opinions, reported at *Demette v. Falcon Drilling Company, Inc.*, 253 F.3d 840 (5th Cir. 2001). The parties may file on or before January 30, 2002 any supplemental briefs in support of or opposition to the petition for rehearing *en banc* in light of these revised opinions.

Appellee R & B Falcon Drilling USA, Inc. sued appellant Frank's Casing & Crew Rental Tools, Inc. for indemnity when a Frank's employee sued Falcon under the Longshore and Harbor Workers' Compensation Act[1] for injury sustained while working on a Falcon jack-up rig in the Gulf of Mexico. Frank's argued that the indemnity agreement was voided by LHWCA or by Louisiana law. The district court held that the indemnity agreement was valid.

Determining the validity of the indemnity agreement requires a foray into the federal statutes defining the law applicable to offshore drilling on jack-up rigs. We first consider the application of the Outer Continental Shelf Lands Act ("OCSLA")[2] and then construe the LHWCA. We conclude that the OCSLA applies to a rig jacked-up over the outer continental shelf; that state law does not apply to this case by operation of the OCSLA, but the LHWCA

---

[1] 33 U.S.C.A. § 901 *et seq.* (2000).

[2] 43 U.S.C.A. § 1331 *et seq.* (2000).

does; and that the LHWCA does not invalidate the indemnity agreement. We affirm.

I

Frank's Casing & Crew Rental Tools, Inc. and R & B Falcon Drilling USA, Inc. are both contractors with Union Oil Company of California for Unocal's offshore drilling operations. Frank's provides casing services. "Casing" is an activity performed during the drilling for oil, whether onshore or offshore; it involves the "welding together and hammering of pipe into the subsurface of the earth to create a permanent construction."[3]

Frank's and Unocal signed a "Services and Drilling Master Contract." Under the Master Contract, Frank's provided casing services to Unocal at offshore drilling sites. Under the Master Contract, Unocal agreed to defend and indemnify Frank's against any liabilities Frank's owes to Unocal, and Frank's agreed to defend and indemnify Unocal and all of its contractors and subcontractors against liabilities they may owe to Frank's. Falcon was a contractor of Unocal.

Falcon provides movable rigs from which casing crews drill offshore wells. Falcon has an "Offshore Daywork Drilling Contract" with Unocal. This contract provided Unocal with access to all of Falcon's vessels for offshore drilling. Falcon provided Unocal

---

[3] *See Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 1115, 1118 n.2 (5th Cir. 1992).

3

the Fal-Rig #85, a jack-up drilling rig.  A jack-up drilling rig is a floating rig with legs that can be lowered into the seabed.  Once the legs are secured in the seabed, the rig can be "jacked-up" out of the water to create a drilling platform.  The process can be reversed, and a jack-up rig can be towed to new sites.[4]

Pursuant to the Master Contract between Frank's and Unocal, plaintiff Kermit Demette, an employee of Frank's, worked aboard the Fal-Rig #85.  Demette was injured while performing casing work as a welder on the Fal-Rig #85.  He was part of a "hammer job," which involves a casing crew welding together sections of pipe end-to-end as the pipe is driven into the seabed by a large hammer.  While Demette was working at the base of the derrick where the pipe was being driven, a metal retaining ring used to secure hoses fell from the derrick, striking him on the head.  At the time of Demette's injury, the Fal-Rig #85 was jacked up.  Its legs rested on the outer continental shelf of the United States beyond the territorial waters of Louisiana.[5]

Demette sued Falcon for his injuries.  Falcon, pursuant to the Offshore Daywork Drilling Contract, filed a third-party complaint against Unocal for defense and indemnity.  Unocal voluntarily assumed the defense of Falcon.  Falcon then filed a third-party

---

[4] Thomas J. Schoenbaum, 1 *Admiralty and Maritime Law* § 3-9, 100 n.8 (West 2d Ed. 1994), describes jack-up rigs and other rigs.

[5] In this opinion, we define OCS to exclude lands lying beneath the territorial waters of the states.  *See* 43 U.S.C. § 1331(a).

complaint against Frank's, seeking defense and indemnity pursuant to the Master Contract.

The district court granted summary judgment to Falcon on the issues of whether Frank's owed defense and indemnity to Falcon. Frank's agreed to fund a settlement with Demette and to pay Falcon's defense costs, but made a full reservation of appeal rights. A consent judgment was entered pursuant to this agreement.

Frank's appeals the summary judgment ruling on indemnity and defense.

II

The Outer Continental Shelf Lands Act[6] provides comprehensive choice-of-law rules and federal regulation to a wide range of activity occurring beyond the territorial waters of the states on the outer continental shelf of the United States. Relevant to this case, it applies federal law to certain structures and devices on the OCS, incorporates state law into federal law on the OCS, and applies the LHWCA to certain injuries sustained by persons working on the OCS.

In this case, the parties dispute whether Louisiana state law governs the Master Contract and whether the OCSLA makes the Longshore and Harbor Workers' Compensation Act[7] applicable to

---

[6] 43 U.S.C.A. § 1331 *et seq.* (2000).

[7] 33 U.S.C.A. § 901 *et seq.* (2000).

Demette's injuries.  First, we must determine whether the injury occurred on an OCSLA situs; if so, we then have two inquiries: we must determine whether OCSLA makes state law applicable; and we must determine if the injured party's status makes the LHWCA applicable under OCSLA.  We begin with a review of the three OCSLA inquiries we must make in this case.

*A. Section 1333(a)(1): Situs Test*

Section 1333(a)(1) describes the reach of the OCSLA and applies federal law within this scope.  It states that the laws and jurisdiction of the United States extend

> to the subsoil and seabed of the [OCS] and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exporing [sic] for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the [OCS] were an area of exclusive Federal jurisdiction located within a state.[8]

The Supreme Court and the Fifth Circuit have held that this section creates a "situs" requirement for the application of other sections of the OCSLA, including sections 1333(a)(2) and 1333(b).[9]  Neither the Supreme Court nor this court has parsed the precise language of

---

[8] 43 U.S.C.A. § 1333(a)(1).

[9] *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 217-20 & 220 n.2 (1986); *Mills v. Director, OWCP*, 877 F.2d 356, 361-62 (5th Cir. 1989) (en banc).

the statute to specify the exact contours of the situs test it establishes.[10] We are called upon to do so today.

We rely on the text of the statute. A close inspection of section 1333(a)(1) reveals that it applies to two primary sets of subjects: "to the subsoil and seabed of the [OCS]"; and "to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed." This latter category is further divided into two categories: those artificial islands, installations, or devices "erected" on the OCS "for the purpose of exploring for, developing, or producing resources" from the OCS, and those "other than a ship or vessel" whose purpose is "transporting such resources."[11]

---

[10] *Mills* interpreted section 1333(b) and held that it could not apply to injuries that do not occur on or over the OCS. 877 F.2d at 362.

[11] 43 U.S.C.A. § 1333(a)(1). The reference "any such installation or other device" suggests that Congress treated "installation or other device" as a unit separate from "artificial islands." In the context of the entire section, however, it is clear that Congress used "artificial islands, installations, and other devices" as a single category. *See* 43 U.S.C.A. § 1333(c) (using the phrase "artificial island, installation, or other device referred to in subsection (a) of this section"); 43 U.S.C.A. § 1333(d)(2) (same); 43 U.S.C.A. § 1333(d)(1) (using the phrase "artificial islands, installations, and other devices referred to in subsection (a) of this section"); 43 U.S.C.A. § 1333(e) (same); 43 U.S.C.A. § 1333(f) (same). Further, it is hard to imagine an artificial island that is not subsumed into the category "installations and other devices permanently or temporarily attached to the seabed." Making sense of text and context, we conclude that "artificial islands, and all installations and other devices" form a single category.

7

Thus, the OCSLA draws important distinctions between the two categories of artificial islands, installations, and other devices. Each category is defined by the purpose of the device—the former, extraction of resources; the latter, transportation of resources. The former also includes the phrase, "which may be erected [on the OCS]," while the latter does not. Conversely, the latter contains the phrase, "other than a ship or vessel," while the former does not.

We incorporate these distinctions into the following rule:

The OCSLA applies to all of the following locations:
(1)  the subsoil and seabed of the OCS;
(2)  any artificial island, installation, or other device if
    (a)  it is permanently or temporarily attached to the seabed of the OCS, and
    (b)  it has been erected on the seabed of the OCS, and
    (c)  its presence on the OCS is to explore for, develop, or produce resources from the OCS;
(3)  any artificial island, installation, or other device if
    (a)  it is permanently or temporarily attached to the seabed of the OCS, and
    (b)  it is not a ship or vessel, and
    (c)  its presence on the OCS is to transport resources from the OCS.


*B. Section 1333(a)(2): Incorporation of State Law*

If the situs test is met, section 1333(a)(2) provides that "[t]o the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws . . . the civil and criminal laws of each adjacent State . . . are hereby declared to be the law of the United States [on OCS situses as defined by section 1333(a)(1)]." Sections 1333(a)(1) and 1333(a)(2) together

provide a rule for the incorporation of state law as surrogate federal law governing claims arising out of activity on the OCS. This court has articulated the rule in a three-part test announced in *Union Texas Petroleum Corp. v. PLT Engineering* ("*PLT*"):[12]

> [For state law to govern,] (1) The controversy must arise on a situs covered by OCSLA (i.e., the subsoil, seabed, or artificial structure permanently or temporarily attached thereto). (2) Federal maritime law must not apply of its own force. (3) The state law must not be inconsistent with Federal law.[13]

For disputes arising out of contracts—including indemnity contracts for offshore drilling—the courts of this circuit have held that if the contract is a maritime contract, federal maritime law applies of its own force, and state law does not apply.[14]

### C. Section 1333(b): Status Test

Section 1333(b) extends the LHWCA to non-seamen employed on the OCS. Specifically, it creates the following "status" test: the LHWCA applies to injuries "occurring as a result of operations conducted on the [OCS] for the purpose of exploring for, developing, removing, or transporting by pipeline the natural

---

[12] 895 F.2d 1043 (5th Cir. 1990).

[13] *Id*. at 1047.

[14] *See Hodgen v. Forest Oil Corp.*, 87 F.3d 1512, 1526 (5th Cir. 1996) (observing that the second factor in the *PLT* test is identical to the determination that the contract is maritime); *Diamond Offshore Co. v. A&B Builders, Inc.*, 75 F. Supp. 2d 676, 681 (S.D. Tex. 1999) (applying *Hodgen* to an indemnity contract).

resources . . . of the [OCS]."[15]  In order for the LHWCA to apply by virtue of section 1333(b), notwithstanding any application of the LHWCA of its own force, the injured worker must satisfy the "status" requirement of section 1333(b) as well as the situs requirement of section 1333(a)(1).[16]

## III

### A. Situs Test

Here, the situs requirement of section 1333(a)(1) is met.  The Fal-Rig #85 was jacked-up over the OCS at the time of Demette's injury.  It therefore falls into the second category of OCSLA situses: it was a device temporarily attached to the seabed, which was erected on the OCS for the purpose of drilling for oil.[17]

Frank's argues that since the Fal-Rig #85 is a vessel,[18] the

---

[15] 43 U.S.C.A. § 1333(b). Section 1333(b)(1) expressly excludes masters and crew of vessels.

[16] *See Mills*, 877 F.2d at 361-62.

[17] 43 U.S.C.A. § 1333(a)(1).

[18] This is beyond dispute.  This circuit has repeatedly held that special-purpose movable drilling rigs, including jack-up rigs, are vessels within the meaning of admiralty law. *See, e.g., Smith*, 960 F.2d at 460; *Offshore Co. v. Robison*, 266 F.2d 769, 776 (5th Cir. 1959).  The dissent's challenge to the definition of vessel is misplaced.  The dissent argues that a jack-up rig stops being a vessel when it jacks up.  Tinkering with the maritime definition of vessel would overturn a centuries-old understanding of what constitutes a vessel. *See The Robert W. Parsons*, 191 U.S. 17, 28-32 (1903) (reviewing authority).  As long as a boat is able and intended to return to navigation, it remains a vessel, even when in dry dock, storage on land, or otherwise removed from the water.

OCSLA cannot apply to this case. Frank's argument is that the qualifier "other than a ship or vessel" in section 1333(a)(1) precludes the application of the OCSLA. This argument has no merit. As discussed above, the statute twice refers to artificial islands, installations, and other devices permanently or temporarily attached to the seabed. Once it inserts the qualifier "other than a ship or vessel"; once it does not. We give effect to the different wording of the two phrases by reading them differently.[19]

---

*See* Thomas J. Schoenbaum, 1 *Admiralty and Maritime Law* 88-92 (West 2d ed. 1994). This circuit has repeatedly rejected the notion that removing a vessel's hull from the water divests it of vessel status. *See American Eastern Development Corp. v. Everglades Marina, Inc.*, 608 F.2d 123, 124-25 (5th Cir. 1979) (contractual action involving boat in dry storage); *Delome v. Union Barge Line Co.*, 444 F.2d 225, 228-32 (5th Cir. 1971) (unseaworthiness action involving boat undergoing repairs on marine railway). Thus, the dissent's argument that a jack-up rig stops being a vessel when it temporarily lifts out of the water implicates the treatment of any boat, ship, barge, or special-purpose vessel that is temporarily taken out of navigation. Further, the dissent's definition of vessel, which requires that the object "float on water," would also exclude submersible rigs and submarines (when submerged), and boats employing hydrofoils (which displace less water than their mass).

[19] *See Rusello v. United States*, 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each."). Also, the use of the term "temporarily" implies that devices that can detach from the seabed and are capable of movement on the sea—i.e., vessels—can fall within the scope of the OCSLA. The distinction the statute draws between devices used to extract and devices used to transport resources serves to exclude vessels that merely transport resources: oil tankers and the like. The transport devices covered by the OCSLA are pipelines, which are explicitly mentioned in section 1333(b), and similar structures. A further indication that the statute contemplates vessels being OCSLA situses is section 1333(b)'s exclusion of "a master or member of a crew of any vessel"

11

This result is consistent with the precedent of this circuit. As we noted in *Hodgen v. Forest Oil Corp.*,[20] our holding in *Domingue v. Ocean Drilling and Exploration Co.*[21] implicitly supports the holding that a jacked-up rig is an OCSLA situs. *Domingue* applied state law to an indemnity agreement regarding an injury on a jacked-up drilling rig, but failed to explicitly address the situs requirement of the OCSLA, focusing instead on the question of whether state law applied.[22] Since the incident occurred on the OCS beyond the territorial waters of Louisiana, the only way state law could have operated was by incorporation into federal law under OCSLA.[23]

---

from LHWCA coverage on OCSLA situses. If OCSLA situses are never vessels, this provision would be mere surplusage. The dissent's contention that an OCSLA situs cannot be a vessel ignores these textual indications to the contrary.

[20] 87 F.3d 1512 (5th Cir. 1996).

[21] 923 F.2d 393 (5th Cir. 1991).

[22] *Id.* at 395-98. *Hodgen*, 87 F.3d at 1525-26, notes that *Domingue* failed to discuss the situs requirement.

[23] Frank's cites a number of cases challenging this conclusion, none of which are apposite. Frank's relies on *Smith v. Penrod Drilling Corp.* 960 F.2d 456 (5th Cir. 1992), in arguing that a vessel cannot be an OCSLA situs. The holding of *Smith* was that maritime law, and not Louisiana law, applied to an indemnity agreement regarding a jack-up rig. *Id.* at 461. This is a straightforward application of the second prong of the *PLT* test and has nothing to do with the question of whether jack-ups can be OCSLA situses. Indeed, *Smith* explicitly found that since the accident that implicated the indemnity agreement occurred on a fixed, permanent platform, it need not address the question of whether a jack-up is an OCSLA situs. *Dupre v. Penrod Drilling Corp.*, 993 F.2d 474, 476-77 (5th Cir. 1993), follows *Smith* in this

The amicus supporting Frank's quotes *Longmire v. Sea Drilling Corp.*,[24] which states: "The OCSLA covers fixed platform workers, while floating rig workers, even those whose tasks are essentially identical to the tasks performed by fixed platform workers, are treated differently."[25] This out-of-context statement cannot carry Frank's case. In the context of the facts of the case, this statement addresses the fact that the employee was injured on a tender working alongside a fixed platform.[26] Tenders are vessels (in *Longmire* it was a converted warship) that are often anchored next to drilling platforms to service the platforms and ferry workers to and from the shore. *Longmire* does not involve a floating rig, let alone a jack-up rig; the "floating" rig the opinion refers to is this tender, which was attached to the OCS

---

regard and is equally distinguishable. Frank's also cites *Tennessee Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 155-56 (5th Cir. 1996), for the proposition that vessels are not within the OCSLA jurisdiction for removal purposes. This claim is incorrect. *Tennessee Gas Pipeline* finds removal jurisdiction over maritime claims involving a fixed platform that was within OCSLA jurisdiction; it makes no claims about vessels. Frank's claim stems from its confusion of "vessels" with "maritime claims." While maritime claims cannot generally be removed to federal court, claims arising under federal statute can be. While the presence of a vessel in the facts of a case may allow a plaintiff to allege claims under maritime law, the presence of a vessel does not convert other, non-maritime claims into unremovable maritime claims.

[24] 610 F.2d 1342 (5th Cir 1980).

[25] *Id.* at 1348.

[26] *Id.* at 1344-45.

only by an anchor. In *Parks v. Dowell Division of Dow Chemical Corp.*,[27] we explained *Longmire*, noting that tenders are not extensions of drilling rigs fixed to the seabed, and the OCSLA does not apply to them.[28] *Longmire*'s conclusion that a tender is not an OCSLA situs is not relevant to the facts of this case.[29]

In sum, this case arises out of an injury on an OCSLA situs. Since the section 1333(a)(1) requirement is satisfied, the OCSLA applies to this case.

## B. Incorporation of State Law

The next logical step is to consider whether Louisiana law applies as a surrogate to federal law under section 1333(a)(2). As stated above, this circuit applies the *PLT* test to determine the application of state law. The second prong of the *PLT* test is that maritime law does not apply of its own force. Because maritime law

---

[27] 712 F.2d 154 (5th Cir. 1983).

[28] *See id.* at 157. Although arguably an anchor "attache[s]" a ship to the seabed, a tender, unlike a jack-up rig, is not "erected" on the OCS.

[29] Frank's also cites legislative history stating that the phrase "waters above the [OCS]" was deleted from the situs requirement of what became section 1333(b) in order "to make more definite the application of the [LHWCA] to workers other than those employed on vessels." Sen. Rep. No. 411, 83d Cong., 1st Sess. 16, 23 (1953). Unfortunately for Frank's, the situs requirement that this deletion left behind was later deleted, leaving no situs requirement in the enacted version of that subsection. As noted above, section 1333(b) contains only a status requirement.

14

applies of its own force, Louisiana law does not apply in this case.[30]

Maritime law applies to the Master Contract between Unocal and Frank's if the contract is a maritime contract. The Master Contract stated that Frank's would "provide casing installation services." The parties indemnified each other against claims brought by their employees. The contract does not explicitly mention any vessels, and it is unclear whether it contemplated work exclusively offshore or work both offshore and onshore.

Determining whether a contract relating to offshore drilling is maritime is often a perplexing affair.[31] This circuit utilizes the two-step test of *Davis & Sons, Inc. v. Gulf Oil Corp.*,[32] to determine whether a contract is maritime. We consider, first, the contract's "historical treatment in the jurisprudence" and, second, the specific facts of the case.[33] For some categories of contracts,

---

[30] Since Louisiana law does not apply, we need not decide whether it is inconsistent with federal law in this case. If the contract in this case were not maritime, we would then consider whether Louisiana law is inconsistent with applicable federal law.

[31] *See Davis & Sons, Inc. v. Gulf Oil Corp.*, 919 F.2d 313, 315 (5th Cir. 1990) ("The attempt to determine whether a contract, particularly one linked to offshore gas and oil production, is governed by state or maritime law has led to much confusion.").

[32] 919 F.2d 313, 315 (5th Cir. 1990).

[33] *Id.* at 316; *see also Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 1115, 1121 (5th Cir. 1992) (describing two-step character of the *Davis* test).

15

the historical treatment is sufficiently clear that the fact-specific inquiry becomes unimportant.[34]  This is such a case.

This court has held that indemnity provisions in contracts to provide offshore casing services are maritime.[35]  Even a contract for offshore drilling services that does not mention any vessel is maritime if its execution requires the use of vessels.[36]  This is true for contracts that may also involve obligations performed on land.[37]  Thus, circuit precedent virtually compels the conclusion that this is a maritime contract.

The *Davis* factors confirm this result.  *Davis* lists six factors to consider in determining whether the facts of the case

---

[34] An example of such a case is *Smith*, 960 F.2d at 459-60.

[35] *See Campbell v. Sonat Offshore Drilling*, 979 F.2d at 1120-21; *see also Smith*, 960 F.2d 456 (holding that contract to "work over" a jack-up rig is maritime); *Diamond Offshore Co. v. A&B Builders, Inc.*, 75 F. Supp. 2d 676, 679-81 (S.D. Tex. 1999) (holding that a contract for repair of a jack-up rig is maritime); *Gilbert v. Offshore Production & Salvage, Inc.*, 1997 WL 149959, at *4 (E.D. La. March 21, 1997) (holding that a contract to provide drilling supervision services is maritime); *Campbell v. Offshore Pipeline, Inc.*, 1993 WL 302623, at *3-4 (E.D. La. Aug. 5, 1993) (holding that a contract for welding services of pipeline on the OCS is maritime).

[36] *See Lewis v. Glendel Drilling Co.*, 898 F.2d 1083, 1086 (5th Cir. 1990) (holding that a contract to provide offshore drilling services is maritime even if it does not mention vessels). Contracts involving vessels tend to be deemed maritime. *See PLT*, 895 F.2d at 1048 (describing an "oversimplified" test as "whether the transaction relates to ships and vessels, masters and mariners, as the agents of commerce").  Schoenbaum, 1 *Admiralty and Maritime Law* § 3-10 provides an extensive list of contracts found to be maritime and non-maritime.

[37] *See Davis*, 919 F.2d at 315-16.

lend the contract a sufficiently "salty flavor"[38] for a court to deem it maritime:

> 1)    what does the specific work order in effect at the time of the injury provide?
> 2)    what work did the crew assigned under the work order actually do?
> 3)    was the crew assigned to do work aboard a vessel in navigable waters[?]
> 4)    to what extent did the work being done relate to the mission of the vessel?
> 5)    what was the principal work of the injured worker? and
> 6)    what work was the injured worker actually doing at the time of the injury?[39]

In this case, Demette's work order provided for a hammer operator, a hammer mechanic, and four welders, including Demette, to drive and weld 416 feet of pipe from the Fal-rig #85 while the rig was jacked-up; this crew actually performed the hammer job the work order described; Demette was working on a vessel over navigable waters; casing is an integral part of drilling, which is the primary purpose of the vessel; and Demette's principal work was as a welder performing casing work; and Demette was performing casing services at the time of the accident.  Thus, all six factors point to the same conclusion: the contract and the injury that invoked it were maritime in nature.

*C. Status Test*

---

[38] *See Kossick v. United Fruit Co.*, 365 U.S. 731, 742 (1962).

[39] *Davis*, 919 F.2d at 316.

Having concluded that the OCSLA applies, but does not incorporate state law, the only remaining issue under the OCSLA is whether the LHWCA applies to Demette by virtue of section 1333(b) of the OCSLA. It does. Demette was injured while doing casing work. Casing work is the model case of injuries "occurring as a result of operations conducted on the [OCS] for the purpose of exploring for, developing, removing, or transporting by pipeline the natural resources . . . of the [OCS]."[40]

We thus conclude that the injury occurred on an OCSLA situs, that Louisiana law does not apply, and that the LHWCA applies to this case by virtue of section 1333(b). We now address the consequences of our conclusion that section 1333(b) applies the LHWCA to this case.

IV

The LHWCA provides the exclusive remedies for injuries to employees injured while subject to the LHWCA.[41] It creates for such employees an action against the vessel (including its owner) on which the employee was working when injured.[42] Section 905(b) of the LHWCA bars employers from indemnifying the vessel from LHWCA

---

[40] 43 U.S.C.A. § 1333(b). That Demette may be a longshoreman by operation of the LHWCA itself seems to be of little consequence; the language of the OCSLA is clear. This point becomes important in the analysis of 33 U.S.C.A. § 905(c) below.

[41] *See* 33 U.S.C.A. § 905(a).

[42] *See* 33 U.S.C.A. § 933.

liability.[43]  However, if the injured employee is entitled to the benefits of the LHWCA "by virtue of" section 1333(b) of the OCSLA, then section 905(c) of the LHWCA states that "any reciprocal indemnity provision" between the vessel and the employer is enforceable.[44]

Central to this case is the meaning of the phrase "by virtue of."  Frank's argues that Demette is directly covered by the LHWCA,[45] and therefore section 905(b) bars the indemnity agreement between Falcon and Frank's.  Frank's reads section 905(c) to apply only to persons entitled to receive LHWCA benefits *exclusively* "by virtue of" the OCSLA.  We acknowledge that this interpretation would not do violence to the text of the statute.

Ordinarily, however, we should give the words of statutes their plain meaning.  The most obvious meaning of "by virtue of section 1333" is simply that the worker is covered by section 1333.  For example, it is perfectly sensible to say, "Demette is eligible to receive LHWCA benefits by virtue of section 1333 and also by virtue of the LHWCA itself."  This sentence makes sense because we

---

[43] *See* 33 U.S.C.A. § 905(b).

[44] *See* 33 U.S.C.A. § 905(c).

[45] Both parties seem to agree that Demette is a longshoreman by operation of the LHWCA itself.  To qualify as a longshoreman under the LHWCA, the employee must be engaged in maritime employment over navigable water, but not a seaman. *See* 33 U.S.C.A. § 902(3); *Director, OWCP v. Perini North River Assoc.*, 459 U.S. 297 (1983).

understand that "by virtue of" does not imply exclusivity. The adverbs "exclusively" or "solely" would have indicated the meaning Frank's advocates, but those words are absent from the statute.

We might question our plain meaning interpretation of "by virtue of" if Frank's identified something in the context of the statute that indicated that those words have a narrower, more technical meaning. But there is none. Further, what little legislative history section 905(c) has supports our reading of the text. Congress enacted section 905(c) as part of the Longshore and Harbor Workers' Compensation Act Amendments of 1984.[46] The House Conference Report[47] discusses language in the Senate version of the bill; this language became section 905(c). The Conference Report stated that "the Senate bill provides an exemption to the Longshore Act's current proscription of indemnity agreements under section [905(b)] of the Act. . . . The bill would legalize those indemnity agreements insofar as they apply to the Outer Continental Shelf." Thus, the Conference Report treats section 905(c)'s limitation to persons entitled to benefits "by virtue of section 1333" as applying to all persons connected to the OCS, as defined by the OCSLA, without any reference to any exception for persons qualifying directly under the LHWCA.

---

[46] Pub. L. No. 98-426, 98 Stat. 1639 (1984).

[47] H. Conf. Rep. No. 98-1027 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2771.

Frank's argues that construing section 1333(b) to apply to workers already directly covered by the LHWCA causes some anomalies. While this may be so, this is a result of the existence of section 905(c), not of any interpretation of section 905(c). Any line we draw will leave some indemnity agreements valid and others invalid. A line between LHWCA employees on permanent platforms and all other LHWCA employees is not any more arbitrary than a line between LHWCA employees on permanent or temporary platforms and all other LHWCA employees. In fact, as Judge Sear cogently argued in *Campbell v. Offshore Pipeline, Inc.*,[48] interpreting section 905(c) to include employees who are covered by virtue of both the LHWCA and OCSLA eliminates some anomalies.[49]

Given that section 1333(b) of the OCSLA applies to Demette, the plain language of section 905(c) dictates that the indemnity contract, if reciprocal, is valid, notwithstanding section 905(b).[50] Since Frank's and Unocal each indemnified the other, the indemnification is reciprocal and therefore valid.[51]

---

[48] 1993 WL 302623 (E.D. La. Aug. 5, 1993).

[49] *See id.* at *5 (noting that a contrary interpretation would lead to different treatment of two indemnity agreements when two workers are injured on the same platform, but one is not entitled to benefits directly under the LHWCA).

[50] Frank's also argues that this interpretation of section 905(c) renders section 905(b) a nullity. This is nonsense. Section 905(c) applies only on the OCS and only when the contract is reciprocal.

[51] That Falcon was not a signatory to the reciprocal Unocal-Frank's indemnity agreement does not alter this result. We have so

21

Frank's finally argues that even if section 905(c) removes the section 905(b) prohibition, Louisiana law invalidates the indemnity agreement. As we have already concluded, however, Louisiana law does not apply to this contract.

V

In sum, the OCSLA applies to this case; Louisiana law does not apply as surrogate federal law under the OCSLA; and because Demette is subject to the LHWCA by virtue of the OCSLA, the indemnity agreement between Unocal and Frank's is valid.

In reaching this conclusion, we acknowledge the dissent's puzzlement at the conclusion that a jack-up rig is a vessel and that maritime law can apply on an OCSLA situs. But we disagree that en banc reversal of established circuit precedent is in order. Although current law suffers from the inconsistencies the dissent complains of, changing the law of this circuit may not improve the situation.[52] Instead, the source of the dissent's vexation is the

---

held in *Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 1115, 1124 (5th Cir. 1992).

[52] The dissent's recourse to legislative history of the OCSLA to argue that OCSLA situses cannot also be deemed vessels does not grapple with the text of the OCSLA, which contemplates OCSLA situses that are vessels. *See* Parts II.A and III.A. We also note that even if we were to ignore the text of the OCSLA, examination of the purposes of the OCSLA does not yield so clear an answer as the dissent indicates. This circuit has noted that OCSLA was originally designed as a gap-filling statute. *Mills v. Director, OWCP*, 877 F.2d 356, 358 (5th Cir. 1989) (en banc). This was because fixed platforms on the OCS were neither vessels nor within the territorial jurisdiction of any state; thus, no law applied to them. The OCSLA filled this gap by applying state law as surrogate

22

OCSLA itself, a statute that by introducing the law of terra firma to a seaward realm requires unavoidably arbitrary line-drawing between the application of terrestrial law and the law of the sea.[53]

We AFFIRM the district court's grant of summary judgment against Frank's.

---

federal law to those platforms. Floating rigs, however, were always subject to maritime law, and thus did not linger in the lawless limbo occupied by drilling platforms prior to the enactment of the OCSLA. Thus, applying the OCSLA's choice-of-law provision only when "maritime law [does] not apply of its own force," *PLT*, 895 F.2d at 1047, is consistent with the gap-filling purpose of the OCSLA.

[53] By applying state law as surrogate federal law to offshore situses, the OCSLA requires courts to draw lines between the zones in which surrogate federal law applies and in which admiralty law applies. No interpretation of the OCSLA can eliminate the arbitrariness of such lines. Our circuit precedent essentially draws a line between floating rigs and fixed platforms, which may seem arbitrary in light of the purposes cited by the dissent. *PLT*, 895 F.2d at 1047. One alternative, treating jack-up rigs as vessels but also applying to them surrogate federal law instead of maritime law, would draw a strange line between rig operators who are permanently assigned to floating rigs (who are crew members, and thus would be excluded from LHWCA coverage by section 1333(b)(1), but would also lack seaman's remedies because maritime law would not apply) and rig operators temporarily assigned to floating rigs or assigned to platforms (who are covered by the LHWCA by section 1333(b)). Another alternative, proposed by the dissent, would deem floating rigs no longer vessels when they jack-up on the OCS. This draws an equally strange line between rigs that lift out of the water to drill and rigs that do not, even when both are OCSLA situses. Further, this creates the problem of determining when a rig has been sufficiently jacked-up to switch the applicable law from admiralty to surrogate federal law. This in turn complicates questions of what law applies to incidents that occur while a rig is jacking up or which law applies to contracts governing the use of jack-up rigs.

DeMOSS, Circuit Judge, dissenting:


Because the panel majority arrives at their decision in this case without consideration of three Supreme Court cases and two statutory amendments which I think require a different conclusion, I respectfully dissent.


### *Rodrigue* -- The First Supreme Court Case

On August 7, 1953, the United States Congress passed the Outer Continental Shelf Lands Act (hereinafter "OCSLA"), which extended federal law (and adjacent state law) "to the sub-soil and seabed of the Outer Continental Shelf and <u>to all artificial islands and fixed structures which may be erected thereon for the purpose of exploring for, developing, removing, and transporting resources therefrom</u>." *See* § 4(a)(1), 67 Stat. 642 (emphasis added).[54]  The

---

[54]    In 1953, there were no "jack-up rigs" operating in the area defined as the Outer Continental Shelf.  The engineering and technological skills which produced the first "jack-up" rig were not developed until in the late 1950s and early 1960s.  The use of the term "fixed structures" in the OCSLA was descriptive of the type of devices actually being used on the OCS; and therefore should probably not be read as restrictive to those structures only.  In its traditional usage, the term "fixed structure" referred to a structure that's components were manufactured on shore, then floated out to a well site on barges, and then assembled and erected on site in the water.

extension of federal law contemplated by this provision was to be "to the same extent as if the Outer Continental Shelf were an area of exclusive federal jurisdiction located within a state." *Id*. The subsequent sub-paragraph of this same section provided that the civil and criminal laws of each adjacent state "are hereby declared to be the law of the United States for that portion of the sub-soil and seabed of the Outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the state if its boundaries were extended seaward to the outer margin of the Outer Continental Shelf."[55]

This Circuit considered the significance of these statutory provisions in two cases, *Dore v. Link Belt Co.*, 391 F.2d 671 (5th Cir. 1968), and *Rodrigue v. Aetna Casualty & Surety Co.*, 395 F.2d 216 (5th Cir. 1968). Each of these cases involved the death of a worker which occurred on a drilling rig on a fixed platform on the Outer Continental Shelf. In each case, the plaintiff sought relief under Louisiana state law, which they contended was made applicable

---

[55]     The phrases "general admiralty law" and "maritime law" do not appear anywhere in the OCSLA as originally passed in 1953; and these phrases were not inserted by the 1978 Amendments to OCSLA discussed later. Likewise, there is not now (and never has been) any language in the OCSLA which "requires courts to draw lines between the zones in which surrogate federal law applies and in which admiralty law applies" as the majority asserts in footnote 53 of the opinion. Therefore, there is no statutory basis for the majority's holding (based on the second prong of PLT) that we must first determine whether admiralty and maritime law applies of their own accord before applying these choice-of-law provisions of the OCSLA.

25

by OCSLA. The defendants contended that relief could only be made under the Death on the High Seas Act ("DOHSA"). In holding that relief was available only under DOHSA, the Fifth Circuit stated:

> We think that a consideration of both intrinsic and extrinsic factors requires the conclusion that it was the intention of Congress that (a) this occurrence be governed by Federal, not State, law, and (b) that the Federal law thereby promulgated would be the pervasive maritime law of the United States. In connection with the latter phase -- the choice by Congress of maritime law -- it is again important to keep in mind that we are in an area in which Congress has an almost unlimited power to determine what standards shall comprise the Federal law.

*Dore*, 391 F.2d at 675 (quoting *Pure Oil Co. v. Snipes*, 293 F.2d 60, 64 (5th Cir. 1961)).

The Supreme Court granted certiorari in both cases, which were argued together. In an opinion covering both cases, *Rodrigue v. Aetna Casualty & Surety Co.*, 89 S. Ct. 1835 (1969), the Supreme Court in an unanimous decision written by Justice White, reversed the decisions of the Fifth Circuit and stated:

> In light of the principles of traditional admiralty law, the Seas Act [DOHSA], and the Lands Act [OCSLA], we hold that petitioner's remedy is under the Lands Act and Louisiana law. The Lands Act makes it clear that federal law, supplemented by state law of the adjacent State, is to be applied to these artificial islands as though they were federal enclaves in an upland State. This approach was deliberately taken in lieu of treating the structures as vessels, to which admiralty law supplemented by the law of the jurisdiction of the vessel's owner would apply.... Since the Seas Act does not apply of its own force under admiralty principles, and since the Lands Act deliberately eschewed the application of admiralty principles to

26

> these novel structures, Louisiana law is not ousted by the Seas Act, and under the Lands Act it is made applicable.

*Id.* at 1837.  In a very comprehensive discussion of the legislative history of OCSLA, the Supreme Court went on to make the following comments:

> 1.    "Even if the admiralty law would have applied to the deaths occurring in these cases under traditional principles, the legislative history shows that Congress did not intend that result.  First, Congress assumed that the admiralty law would not apply unless Congress made it apply, and then Congress decided not to make it apply.  The legislative history of the Lands Act makes it clear that these structures were to be treated as island or as federal enclaves within a landlocked State, not as vessels."  *Id.* at 1840.

> 2.    "Careful scrutiny of the hearings which were the basis for eliminating from the Lands Act the treatment of artificial islands as vessels convinces us that the motivation for this change, together with the adoption of state law as surrogate federal law, was the view that maritime law was inapposite to these fixed structures."  *Id.* at 1841.

> 3.    "The committee was aware that it had the power to treat activity on these artificial islands as though it occurred aboard ship ....  And the very decision to do so in the initial bill recognized that if it were not adopted explicitly, maritime simply would not apply to these stationary structures...."  *Id.* at 1841 (citations omitted).

> 4.    "[T]he special relationship between the men working on these artificial islands and the adjacent shore to which they commute to visit their families was also recognized by dropping the treatment of these structures as 'vessels' and instead, over the objection of the administration that these islands were not really located within a State, the bill was amended to treat them 'as if (they) were (in) an area of exclusive Federal jurisdiction located within a State.'"  *Id.* at 1842.

In light of the Supreme Court decision in *Rodrigue* and the absence of any later decision by the Supreme Court changing any of

27

its conclusions in **Rodrigue**, I would submit that the following principles are applicable to the case now before us:

> 1.  Structures placed on the Outer Continental Shelf "for the purpose of exploring for, developing, removing, and transmitting resources therefrom," are not vessels;
>
> 2.   Congress decided that maritime law does not apply to these structures; and
>
> 3.   The laws of the State of Louisiana will apply to activities on these structures to the extent that such state laws are not inconsistent with other federal laws.

### The First Statutory Amendment

In 1978, Congress adopted comprehensive amendments to OCSLA. *See* Pub. L. 95-372 (1978).  Section 203(a) of this statutory amendment reads as follows:

> SEC. 203. (a) Section 4(a)(1) of the Outer Continental Shelf Lands Act (43 U.S.C. 1333(a)(1) is amended --
>
> (1) by striking out "and fixed structures" and inserting in lieu thereof ", and all installations and other devices permanently or temporarily attached to the seabed,"; and
>
> (2) by striking out "removing, and transporting resources therefrom" and inserting in lieu thereof "or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources."

The report of the Conference Committee regarding the amendment reads as follows:

> Section 203 -- Laws Applicable to the Outer Continental Shelf

Both the Senate bill and the House amendment amend section 4(A)(1) of the OCS Act of 1953 by changing the term "fixed structures" to "and all installations and other devices permanently or temporarily attached to the seabed" and making other technical changes. The Conference Report retains this language.

The intent of the managers in amending section 4(A) of the 1953 OCS Act is technical and perfecting and is meant to restate and clarify and not change existing law. Under the Conference Report language, federal law is to be applicable to all activities on all devices in contact with the seabed for exploration, development, and production.

H.R. Conf. Rep. No. 95-1474 (1978). The House Committee Report No. 95-590 on this legislation states the following in the section-by-section analysis:

*Section 203.--Laws Applicable to Outer Continental Shelf*

Section (a) amends section 4(a)(1) of the OCS Act of 1953 by changing the term "fixed structures" to "and all installations and other devices permanently or temporarily attached to the seabed" and making other technical changes. It is thus made clear that Federal law is to be applicable to all activities on all devices in contact with the seabed for exploration, development, and production. The committee intends that Federal law is, therefore, to be applicable to activities on drilling ships, semi-submersible drilling rigs, and other watercraft, when they are connected to the seabed by drillstring, pipes, or other appurtenances, on the OCS for exploration, development, or production purposes. Ships and vessels are specifically not covered when they are being used for the purpose of transporting OCS mineral resources.

H.R. Rep. No. 95-590 (1978) (emphasis added).

29

I have found no Supreme Court decision and no Fifth Circuit decision which expressly discuss or interpret the significance of the statutory language change made by the 1978 Amendments to OCSLA regarding deletion of "fixed structures" and insertion of "all installations and other devices permanently or temporarily attached to the seabed" in the definition of the situs to which OCSLA is to apply. We must assume that when it was adopting the 1978 Amendments to OCSLA, Congress was aware of and considered the Supreme Court holding in *Rodrigue*. Since there is nothing in the text of the 1978 Amendments nor in any legislative history which would indicate a desire or intention on Congress' part to change any of the Supreme Court's holdings in *Rodrigue*, we have to assume that Congress accepted those holdings as applicable to the 1978 Amendments. The deletion of the words "and fixed structures" and the insertion of the words "and all installations and other devices permanently or temporarily attached to the seabed" reflect a clear intention on the part of Congress to broaden and clarify the category of structures and facilities to which OCSLA would apply; and the House Committee Report 95-590 expressly identifies "drilling ships, semi-submersible drilling rigs, and other water craft, <u>when they are connected to the seabed by drill string, pipes, or other appurtenances</u> on the OCS for exploration development or production purposes" as being the situs of activities to which OCSLA would apply. In my view, there is

absolutely no question at all that these statutory language changes eliminate the basis for any distinction which our case law may have made in the past as between a "jack-up rig" being a vessel and "a fixed platform" not being a vessel, insofar as activities on the Outer Continental Shelf are concerned.  Both our Circuit and the Supreme Court have clearly indicated that Congress holds the ultimate power in defining applicable law and categorizing the facilities and operations to which it applies when dealing with activities on the Outer Continental Shelf.

The controlling premise of the majority opinion in the case before us is that Fal-Rig 85 is a vessel.[56]  Because it is a vessel, the majority says admiralty and maritime law controls its operations and activities.  Because admiralty and maritime law applies, that body of law prevents and preempts any application of state law.  If the majority's original premise is incorrect, then their house of cards collapses.

In my view, we are bound by the Supreme Court decision in *Rodrigue*, and by Congress' 1978 Amendments to OCSLA, to conclude that when a jack-up rig is operating on the Outer Continental Shelf, it cannot be construed as being a vessel because, in the

---

[56]    In footnote 18 of its opinion, the majority relies on *Offshore Co. v. Robison*, 266 F.2d 769 (5th Cir. 1959), as being the original source of its premise; but the casualty in *Robison* occurred in the territorial waters of the State of Texas and there was no contention nor need for discussion as to the applicability of the OCSLA, which at that time referred to "artificial islands and fixed structures" in its definition of OCSLA situs.

31

statutory language, it is "an installation temporarily attached to the seabed for the purpose of exploring for, or producing oil and gas" or, in the language of the House Committee Report (supra), it is "a watercraft connected to the seabed by drillstring, pipes, or other appurtenances for exploration or production purposes." This conclusion is mandated not only by the new language of OCSLA but also by common sense and plain language interpretation of "what is a vessel."

The dictionary says that a vessel is "a craft for traveling on water." *Webster's Collegiate Dictionary* (Random House 1991). The quintessential characteristics of a vessel are that it floats on water and that it is used for transporting cargo or passengers from one place to another. In order to "float on water," it must be supported by the laws of buoyancy, i.e., it will float to the extent that the volume of water which it displaces weighs more than the vessel and its cargo. However, the mere fact that a structure floats does not mean it is a vessel. A floating dock does float, but it is permanently connected to land and never goes anywhere. Likewise, a restaurant or gambling casino built on a barge is floating, but if it is connected to land by permanent mooring lines and utility lines (water, gas, sewage, electricity, telephones) and never moves, it is not a vessel; it is simply a floating dock with a restaurant on it, which earns money by selling food or games of chance, not by transporting cargo or people. A pontoon bridge

floats, but it is not a vessel because it does not move once it is in place. Using these concepts to assess the characteristics of a jack-up drilling rig, I come to the easy conclusion that a jack-up drilling rig is clearly not a vessel when it is "jacked up." Clearly, when it is jacked up, Fal-Rig 85 is not floating at all. The process of jacking up lifts the hull and work decks of the Fal-Rig 85 completely out of the water. The only parts of the Fal-Rig 85 which are in the water are its legs, which extend downward through the water into the seabed where support for the entire weight of Fal-Rig 85 is found in the sea bottom itself. In the jacked-up position, the hull and work decks of the Fal-Rig 85 are high enough out of the water that neither ocean currents nor wind generated wave action impacts the work area. Finally, in the jacked up position, the Fal-Rig 85 cannot move; its position in terms of longitude and latitude is fixed; it is stationary. The primary purpose for which the Fal-Rig 85 was built is to drill a hole in the earth under water in order to locate oil and/or gas and produce them if found. The Fal-Rig 85 earns its revenue for cutting the hole and completing the well, and it performs these tasks only when it is jacked up. In its jacked up position, the Fal-Rig 85 is functionally indistinguishable from a drilling platform which has been assembled on site in the water: (1) both stand on legs resting on the bottom; (2) both have work decks and platforms high enough above the water to avoid currents and waves; and (3) both conduct drilling and completion activities for oil and

33

gas production.  I can see no rational basis for distinguishing the two platforms.

I recognize that our case law has labeled a jack-up drilling rig as a "special purpose vessel;" but in my view that is a mislabeling that confuses the realities involved and, in light of the 1978 Amendments to OCSLA, should not be applicable to operations on the Continental Shelf.  The "special purpose" of a jack-up rig, which is drilling for oil and gas, has nothing to do with traditional maritime activities or interests.  Drilling for oil and gas does not create any buoys, channel markers, or other aids to navigation.  Drilling for oil and gas does not enhance or improve the navigability of the waters in which it occurs.  Drilling for oil and gas does not facilitate the loading or unloading of vessels.  A jack-up drilling rig is a structure designed and constructed (1) to contain and house in one structure all of the work spaces, living spaces, machinery, and engines, pumps, generators, hoists, pipe racks, derrick, cranes, and other equipment required to conduct drilling operations into the earth and (2) to float in water when required to move from one drill site to another but then jack itself up out of the water to conduct drilling operations.  This unique combination of functions saves time and expense by avoiding the dismantling and disassembly into pieces and units and the reassembling process which inevitably occurs in order to move a shore side drilling rig or a drilling platform which was originally constructed at a site in the water.

While it is true that during the time a jack-up rig is being moved it floats and is moved by tug boats, like a barge, the percentage of time involved in such moves represents only a tiny fraction of the time that it is jacked up in a fixed position engaged in drilling operations.  It is better labeled, therefore, as a "movable drilling platform" for it moves only for the purpose of drilling in another location and while drilling it is a fixed and stationary platform.  To label the Fal-Rig 85 as a "vessel" when it has a casing being driven into the sea floor in anticipation of drilling with a drill stem for thousands of feet into the earth is simply nonsense to me.

In addition to the changes made by Congress in the definition of what constituted a "situs" for purposes of the Outer Continental Shelf Lands Act, the 1978 Amendments to OCSLA also made changes pertinent to our discussion here by (1) adding definitions for the term "exploration," the term "development," and the term "production" which had not previously been included in the 1953 Act; and by (2) deleting from old § 4(c) of the 1953 Act the phrase "described in subsection (b)" and inserting in lieu thereof "conducted on the Outer Continental Shelf for the purpose of exploring for, developing, removing, or transporting by pipeline the natural resources ... of the sub-soil and seabed of the Outer Continental Shelf" as it appeared in old subsection (b) of § 4 of the 1953 Act.  While these amendments were more or less technical in nature, they clearly demonstrate that Congress considered

35

changes needed in § 4(c) and wanted workman's compensation benefits extended to employees who sustain disability or death on the broader definition of situs as contemplated by the amendments to § 4(a)(1) discussed earlier. In this regard, it should be noted that the original 1953 Act contained a definition of "the term 'employee' which makes express that the term does not include "a master or member of a crew of any vessel" and this phraseology was retained in the 1978 amendments to the subsection dealing with the extension of compensation benefits.[57] Consequently, it seems clear to me that as of the time of the 1978 amendments to OCSLA, Congress intended that "employees" working on "all artificial islands and all installations and other devices permanently or temporarily attached to the seabed" would be entitled to receive compensation benefits in accordance with the provisions of LHWCA, but "crew members" of "any vessel" would not be entitled to receive compensation benefits. And this necessarily means that "artificial

---

[57]    In footnote 19 of its opinion, the majority argues that the language excluding "master or number of crew of any vessel" from compensation benefits, indicates a contemplation on the part of Congress that "a vessel can be a OCSLA site" as otherwise this exclusion would be surplusage. But this same exclusionary language was in the original 1953 OCSLA when the definition of a situs was an "artificial island" or "fixed structure" neither of which would have been deemed a "vessel." I suggest that a better reading of this exclusionary language would be that Congress recognized in both the 1953 Act and the 1978 Amendments that there would be vessels (tugs and barges, crew boats, and tankers) transporting personnel and goods, supplies, consumables, and equipment to and from the "artificial islands" however defined; and that the crew members of such vessels would not be entitled to compensation even though they received an injury while actually on such "artificial islands."

islands, etc." and "vessels" are separate and distinct concepts, and we make a mistake when we fail to distinguish them. I have great difficulty, therefore, in understanding how the majority opinion concludes that the Fal-Rig 85 can be both at the same time.

## *Herb's Welding* -- The Second Supreme Court Case

In resolving the interplay between the LHWCA and OCSLA, the decision of the U.S. Supreme Court in ***Herb's Welding, Inc. v. Gray***, 105 S. Ct. 1421 (1985), is the second case I view as controlling. Gray, a welder with Herb's Welding, was employed to help repair and maintain oil and gas pipelines and fixed platform production structures in the Bay Marchand oil and gas field, which is located both in Louisiana territorial waters and in the Outer Continental Shelf. On July 11, 1975, Gray was welding a two-inch gas pipeline on a platform in the navigable waters of Louisiana when an explosion occurred. Gray, in trying to run away from the area, twisted his knee. Gray received workman's compensation benefits under the Louisiana compensation law, but the carrier refused to pay benefits under the LHWCA. An administrative law judge denied Gray's claim for LHWCA benefits because he was "not involved in maritime employment." The Benefits Review Board determined that Gray was covered under the LHWCA and remanded the case for entry of an award. The administrative law judge awarded $10,000 and deducted the $3,000 already awarded under the state compensation

37

law. Herb's Welding appealed the decision of the Benefits Review Board to a panel of the Fifth Circuit, which in April 1983, affirmed the decision of the Benefits Review Board by holding that Gray "was clearly employed in maritime employment and therefore was within the compensation coverage afforded by the LHWCA." *Herb's Welding v. Gray*, 703 F.2d 176, 180 (5th Cir. 1983).

The Supreme Court granted certiorari and promptly reversed. In so doing, the Supreme Court held:

> The rationale of the Court of Appeals was that offshore drilling is maritime commerce and that anyone performing any task that is part and parcel of that activity is in maritime employment for LHWCA purposes. Since it is doubtful that an offshore driller will pay and maintain a worker on an offshore rig whose job is unnecessary to the venture, this approach would extend coverage to virtually everyone on the stationary platform. We think this construction of the Act is untenable.

*Herb's Welding*, 105 S. Ct. at 1426. The Supreme Court went on to analyze its prior cases, particularly its decision in *Rodrique v. Aetna Casualty & Surety*, *supra*, and to describe in some detail the factual circumstances that determine the nature of the employment that Gray was involved in:

> [Gray] built and maintained pipelines and platforms themselves. There is nothing inherently maritime about those tasks. They are also performed on land, and their nature is not significantly altered by the marine environment, <u>particularly since exploration and development of the Continental Shelf are not themselves maritime commerce.</u>

38

*Id*. at 1428 (footnote omitted). In assessing the precedential aspects of the Supreme Court decision in *Herb's Welding*, we need to remember that:

> 1. Gray's injury occurred in 1975 at which time the pertinent statutory provisions were the LHWCA as amended in 1972 and OCSLA as originally passed in 1953;
>
> 2. Gray's injury occurred on a fixed platform in Louisiana territorial waters;
>
> 3. The Supreme Court decision in *Herb's Welding* was issued prior to the effective date of the 1984 amendments to LHWCA; and
>
> 4. The Supreme Court did not address in its decision the applicability of § 1333(b) of OCSLA, either in its form as it existed on the date of injury or as it was amended in 1978 during the course of appeals of Gray's claim through the Benefits Review Board.[58]

Nevertheless, the Supreme Court decision in *Herb's Welding* is especially controlling insofar as it deals with the meaning of the term "maritime employment." The Court in *Herb's Welding* discussed at great length the decision of the Supreme Court in *Rodrique*, *supra*, and reconfirmed all of its essential holdings. In this regard, the Supreme Court in *Herb's Welding* stated:

> We cannot assume that Congress was unfamiliar with *Rodrique* and the Lands Act when it referred to "maritime employment" in defining the term

---

[58] On remand from the Supreme Court, the Fifth Circuit panel quickly concluded that Gray was not entitled to recover under § 1333(b) because of the "geographical limitation imposed by the OCSLA."

> "employee" in 1972. It would have been a significant departure from prior understanding to use that phrase to reach stationary drilling rigs generally.

105 S. Ct. at 1427 (footnote omitted).

After categorizing the Fifth Circuit's view of the term "maritime employment" as "expansive," the Court went on to state:

> The Amendments [1972 amendments to LHWCA] were not meant "to cover employees who are not engaged in loading, unloading, repairing, or building a vessel, just because they are injured in an area adjoining navigable waters used for such activity. H.R. Rep. 92-1441, p. 11 (1972); S. Rep. 92-1125, p. 13 (1972); U.S. Code Cong. & Admin. News 1972, p. 4708. We have never read "maritime employment" to extend so far beyond those actually involved in moving cargo between ship and land transportation. Both *Caputo* and *P.C. Pfeiffer Co.* make this clear and lead us to the conclusion that Gray was not engaged in maritime employment for purposes of the LHWCA.

*Id*. at 1427-28.

I have found no Supreme Court decision subsequent to *Herb's Welding* that purports to overrule in whole or in part the principal core decision that the Supreme Court made in *Herb's Welding*, i.e., that the term "maritime employment" does not include any of the various activities which lessees, operators, contractors, subcontractors, and their employees perform in connection with exploring for, drilling for, producing, and transporting oil and gas from the seabed beneath navigable waters.

40

**1984 Amendments to LHWCA**

The second statutory amendment made by Congress which the panel majority did not consider in arriving at their conclusion is found in a portion of the 1984 amendments to the Longshoreman and Harbor Worker's Compensation Act. These changes relate to the inclusion of new subparagraph (c) in 33 U.S.C. § 905 as it now exists. This change was initiated by a provision in Senate Bill 38 of the 98th Congress First Session set forth in § 4(c) of that bill, which reads as follows:

> (c) Section 5 [of LHWCA] is amended by adding at the end thereof the following new subsection:
>
> "(c) In the event that the negligence of a third party causes injury to a person entitled to receive benefits under this chapter by virtue of section 4 of the Outer Continental Shelf Lands Act (43 U.S.C. 1333), then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such third person in accordance with the provisions of section 33 of this Act. Nothing contained in this chapter, or in any otherwise applicable State law, shall preclude the enforcement according to is terms of any written agreement under which the employer has agreed to indemnify such third party in whole or in part with respect to such action.

S. 38, 98th Cong. § 4(c) (1984) (emphasis added). The House of Representatives declined to go along with the changes contemplated by this section of the Senate Bill and the Conference Committee

appointed to resolve this and other conflicts inserted the language

as it now appears in 33 U.S.C. § 905(c) which reads as follows:

(c) Outer Continental Shelf

In the event that the negligence of a <u>vessel</u> causes injury to a person entitled to receive benefits under this chapter by virtue of section 1333 of Title 43, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such <u>vessel</u> in accordance with the provisions of <u>subsection (b) of this section</u>. Nothing contained in <u>subsection (b) of this section</u> shall preclude the enforcement according to its terms of any <u>reciprocal indemnity provision whereby the employer of a person entitled to receive benefits under this chapter by virtue of section 1333 of Title 43 and the vessel agree to defend and indemnify the other for cost of defense and loss or liability for damages arising out of or resulting from death or bodily injury to their employees</u>.

33 U.S.C. § 905(c) (emphasis added).

The legislative history regarding this change indicates that

the Senate Report stated:

Finally, the Senate Bill provides an exemption to the Longshore Act's current proscription of indemnity agreements under Section 5(b) of the Act. That section is made applicable currently to situations on the Outer Continental Shelf by virtue of Section 4 of the Outer Continental Shelf Lands Act (43 U.S.C. 1333). The bill would legalize those indemnity agreements insofar as they apply to the Outer Continental Shelf and <u>would further preempt the application of state laws prohibiting such indemnity agreements</u>.

S. Rep. No. 98-81 (1983), *reprinted in* 1984 U.S.C.C.A.N. 2771, 2773

(emphasis added).

The report of the Conference Committee states:

> Second, the substitute removes the current proscription with respect to mutual indemnity agreements <u>between employers and vessels</u> as applied to the Outer Continental Shelf by virtue of the Outer Continental Shelf Lands Act.

H.R. Conf. Rep. No. 98-1027 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2771, 2774 (emphasis added).

In my view, it is extremely significant that, as indicated by the underlining in the text of the Senate Bill and the statute as finally passed, the word "third person" in the Senate Bill was changed to the word "vessel" in the statute as finally passed; the internal cross-reference as to the section under which "an action" may be brought was changed from "the provisions of section 33 of this Act" to "the provisions of subsection (b) of this section;" the opening phrase in the last sentence of the Senate Bill which stated "nothing contained in this chapter or in any otherwise applicable state law" was changed to read "nothing contained in subsection (b) of this section" in the statute as passed; and finally, the language at the end of the second sentence referring to "any written agreement under which the employer has agreed to indemnify such third party" was changed to refer to "any reciprocal indemnity provision whereby the employer of a person entitled to receive benefits under this chapter by virtue of section 1333 of Title 43 and the vessel agree to defend and indemnify the other." From these textual changes and legislative history I draw the following conclusions fairly easily:

43

1.    Senate Bill 38 intended to effect a preemption of "otherwise applicable state law," but the final statute as passed says absolutely nothing about that subject;

2.    The change from "third party" to "vessel" considerably narrows the category of parties (1) whose negligence may be the cause of injury to an oil field worker on the Outer Continental Shelf and (2) who would be entitled to be the beneficiary of an indemnity agreement from the employer; and

3.    The term "vessel" as consciously inserted by Congress in § 905(c) must be construed consistently as that same term is used in OCSLA and, therefore, the term "vessel" cannot be taken to mean a situs of offshore oil and gas activity as defined in OCSLA.

## The Third Supreme Court Case -- *Tallentire*

The final Supreme Court case which I look to in assessing the issues in this case is the case of **Offshore Logistics, Inc. v. Tallentire**, 106 S. Ct. 2485 (1986). In **Tallentire**, two offshore drilling platform workers were killed when the helicopter in which they were riding crashed in the high seas some 35 miles off the Louisiana coast while transporting them from the offshore drilling platform where they worked to their home base in Louisiana. The issue in the case revolved essentially around the provisions of § 7 of the Death on the High Seas Act (DOHSA) and the effect, if any, of OCSLA. Survivors of the deceased workers contended that they were entitled to damages based on the Louisiana Wrongful Death Statute, which was made applicable either by its own terms or by the applicability of OCSLA. The federal district court determined that the survivors were entitled to benefits only under DOHSA. In

44

a very long and scholarly opinion, a panel of our Court concluded that § 7 of DOHSA was broad enough on its face to permit the applicability of the Louisiana Wrongful Death Statute and that, as a matter of law, Louisiana has the authority to apply its Death Act to its own citizens on the high seas adjacent to its shores and that, therefore, the survivors may assert a claim under the Louisiana Death Act. *Tallentire v. Offshore Logistics, Inc.*, 754 F.2d 1274 (5th Cir. 1985). On the issue as to whether the Louisiana Wrongful Death Statute applied by way of § 1333 of OCSLA, the Fifth Circuit panel waffled. It assumed that OCSLA does apply but the Louisiana statute would then be in conflict with DOHSA "so Louisiana law could be adopted only to the extent it is not inconsistent with DOHSA."[59] *Id.* at 1279.

On appeal to the Supreme Court, the Supreme Court held "that neither OCSLA nor DOHSA requires or permits the application of Louisiana law in this case," and accordingly the Court reversed and remanded the decision of the Fifth Circuit. As was the case in the Fifth Circuit opinion, the larger part of the Supreme Court decision related to the interpretation of § 7 of DOSHA, but the Court did address in clear and expressive language the interplay between DOHSA and OCSLA. *See* 106 S. Ct. at 2491-93. The Supreme

---

[59] Curiously, the text of 43 U.S.C. § 1333 cited in footnote 7 of the Fifth Circuit opinion is the text of subsection (a)(1) as passed in 1953 even though the helicopter crash in *Tallentire* occurred in August 1980, well after the 1978 amendments to OCSLA which broadened the definition of a "situs" as discussed above.

45

Court determined that because the helicopter crash and ensuing death of the platform workers in this case occurred "miles away from the platform and on the high seas," it would not be proper to extend OCSLA to the casualties in this case. In reviewing the history and applicability of OCSLA, the Supreme Court in *Tallentire* stated:

> The intent behind OCSLA was to treat the artificial structures covered by the Act as upland islands or as federal enclaves within a landlocked State, and not as vessels, for purposes of defining the applicable law because maritime law was deemed inapposite to these fixed structures. *See Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 361-366, 89 S. Ct. 1835, 1840-1842, 23 L.Ed.2d 360 (1969). This Court endorsed the congressional assumption that admiralty law generally would not apply to the lands and structures covered by OCSLA in *Rodrigue*, noting that accidents on the artificial islands covered by OCSLA "had no more connection with the ordinary stuff of admiralty than do accidents on piers." *Id.*, at 360, 89 S. Ct., at 1839-1840. *See also Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 422, 105 S. Ct. 1421, 1426, 84 L.Ed.2d 406 (1985). Thus, in *Rodrigue*, the Court held that an admiralty action under DOHSA does not apply to accidents "actually occurring" on these artificial islands, and that DOHSA therefore does not preclude the application of state law as adopted federal law through OCSLA to wrongful death actions arising from accidents on offshore platforms. *Rodrigue v. Aetna Casualty Co.*, *supra*, 395 U.S., at 366, 89 S. Ct., at 1842.

*Id.* at 2491-92. While I recognize that the issue of what constitutes a "situs" as defined in OCSLA was not directly before the court in *Tallentire*, I think this quoted paragraph from *Tallentire* is very instructive as indicating that as of 1986 the

46

Supreme Court was clearly following the jurisprudential analysis of *Rodrigue* and *Herb's Welding* as to whether the "artificial islands" involved in oil and gas production should be considered as "vessels" and that the place where an injury or death occurs is more determinative of the applicability of the Outer Continental Shelf Lands Act than the status of the injured worker as being employed in operations relating to production of oil and gas from the Outer Continental Shelf.

**Undisputed Facts**

At the time of his injury, Demette was employed by Frank's Casing as a welder who welded together the segments of casing as they are installed in an oil and gas well. At the time of his injury, Demette was on the derrick floor of the Fal-Rig 85 and he was struck on the head by some object which fell from the derrick tower above him. At the time of Demette's injury, the process of hammering the casing down into the sea floor was going on which means that the casing pipe extended from the derrick floor down into the seabed beneath the water. At the time of Demette's injury, Fal-Rig 85 was in a jacked-up position and was located on the Outer Continental Shelf adjacent to the State of Louisiana. A blanket service agreement was signed between Union Oil of California (Unocal) and Frank's Casing Crew and Rental, Inc. (Frank's), under the terms of which Frank's was to provide casing

47

installation services as specified in subsequent work orders. The blanket service agreement would cover work orders issued for casing services both onshore and offshore. Frank's would be paid for its services by Unocal. Unocal also had a blanket service agreement with R&B Falcon Drilling USA, Inc. (Falcon). This contract provided Unocal with access to all of Falcon's jack-up drilling rigs for offshore drilling, but it did not specify use of Fal-Rig 85. Each of the Unocal/Falcon and Unocal/Frank's blanket agreements contains indemnity agreements, but there is no contractual agreement of any kind directly between Falcon and Frank's.

Given these undisputed facts, I can easily concur with the majority holding that on the occasion of Demette's injury, Fal-Rig 85 was a situs as defined in OCSLA because it was jacked up out of the water, supported by its legs resting on the sea bottom, and was connected to the sea bottom by the casing being driven into the floor of the ocean for the purpose of exploring for oil and gas. I, likewise, concur with the finding that the majority inferentially makes that at the time of his injury Demette was employed by an employer engaged in operations relating to exploration for and production of oil and gas from the Outer Continental Shelf and that, therefore, he would be entitled to compensation benefits for his injury from his employer under the provisions of § 1333(b) of OCSLA.

48

I have to abandon ship, however, from the rest of the majority's conclusions.  Specifically, I dissent from the following majority conclusions:

1.    "Because maritime law applies of its own force, Louisiana law does not apply in this case."  Majority Opinion at 847.

2.    "Thus all six factors [*Davis* case] point to the same conclusion: the contract and the injury that invoked it were maritime in nature."  Majority Opinion at 848.  While the majority opinion does not specifically say, I have to assume that it is referring to the contract between Unocal and Frank's because that is the only contract in which Frank's agreed to indemnify anybody from anything; and

3.    Section 905(c) of LHWCA validates the indemnity agreement between Unocal and Frank's, a conclusion which I find both unnecessary and incorrect.

**Concluding Comments**

In *Rodrigue*, the Supreme Court held that Congress made an explicit decision that maritime law would not apply to the "artificial islands placed or erected on the Outer Continental Shelf for the purpose of exploration, production, and development of oil and gas resources" when it passed the original OCSLA in 1953.  After the Supreme Court decision in *Rodrigue*, Congress made substantial amendments to OCSLA in 1978, the most significant of which was the elimination of the term "fixed structures" and the insertion of the words "all installations and other devices permanently or temporarily attached to the seabed."  The legislative history of this change contains an express statement

49

that: "The committee intends that federal law is, therefore, to be applicable to activities on drilling ships, semi-submersible drilling rigs, and other watercraft when they are connected to the seabed by drillstring, pipes, or other appurtenances." H.R. Rep. No. 95-590. The key phrase in this new definition is "when they are connected to the seabed by drillstring, pipes, or other appurtenances" because these circumstances result in these "installations and other devices" being "permanently or temporarily attached to the seabed." In this broader definition, Congress drew no distinctions as to whether the attachment was between the seabed and a fixed platform, a movable platform, a semi-submersible platform, or a drilling ship platform. I have to conclude, therefore, that from and after the 1978 Amendments to OCSLA all of our Circuit case law purporting to draw tortuous and complicated distinctions as to what is and is not a "vessel" are just "so much sound and fury signifying nothing" insofar as activities on the Outer Continental Shelf are concerned. Congress spoke originally in 1953, the Supreme Court interpreted in 1969, and Congress spoke again in 1978 without changing or correcting in any way the principles established by the Supreme Court that the artificial islands, structures, installations, and devices temporarily or permanently placed on the Outer Continental Shelf for the purpose of producing oil and gas are not "vessels" and that "maritime law" does not apply to them.

50

As to the conclusion that the contract between Unocal and Frank's was maritime in nature, I think the panel majority's conclusion is in direct conflict with the language of the Supreme Court in *Herb's Welding*. The installation of casing at various stages in the drilling for and producing of an oil and gas well is normal and routine regardless of whether the oil well is producing from dry land on shore or from the seabed. The installation of casing in an oil and gas well has absolutely nothing to do with improving the navigability of the waters in which the well may be drilled, nor does it have anything to do with the placement of an aid to navigation in those waters, nor does it have anything to do with loading or unloading of a vessel. If, as the Supreme Court held in *Herb's Welding*, a welder who repairs gathering pipelines and well production structures is not engaged in "maritime employment" because "there is nothing inherently maritime about those tasks," then in my view the task of welding together segments of casing pipe as they are driven into the seabed, as Demette was doing here in this case, surely should not be deemed a maritime employment. Therefore, the contract between Unocal and Frank's to provide such casing services should not be a maritime contract. Like a ship without an engine or rudder, our Fifth Circuit case law on the subject of "maritime employment" and "maritime contracts" has floated from one side of the Gulf of Mexico to the other depending upon the vagaries of wind and current in each individual

case. I regret to say that our Circuit case law on "what is a vessel" and "what is a maritime contract" and what is "maritime employment" have taken on a Humpty-Dumpty[60] approach -- they are whatever a particular panel says they are. That's a tragic circumstance because it destroys uniformity and predictability of the law; and the only ones who benefit from unpredictability and confusion are lawyers.

In regard to § 905(c) of LHWCA, I have great difficulty in understanding the rather convoluted argument which the majority opinion puts forth as to the applicability of this subsection. If the majority is correct that Fal-Rig 85 is a vessel whose special purpose was to drill an oil and gas well and Demette's assignment of welding together segments of casing pipe was an essential aspect of that special purpose, then Demette was a member of the crew of a vessel and both § 1333(b) of OCSLA and § 902(3)(G) of LHWCA would exclude Demette from any right to compensation benefits under the LHWCA. Even if Demette were determined not to be a member of the crew of the Fal-Rig 85, he would not be entitled to benefits directly under LHWCA because **Herb's Welding** specifically held that activities related to oil and gas production are not maritime

---

[60] "There is glory for you," [said Humpty-Dumpty]. "I don't know what you mean by 'glory,'" Alice said. "I meant 'there is a nice knock-down argument for you," [said Humpty-Dumpty]. "But 'glory' doesn't mean a nice knock-down argument," Alice objected. "When I use a word," Humpty-Dumpty said in a rather scornful tone, "it means just what I choose it to mean, neither more nor less." Lewis Carroll, *Through the Looking Glass* ch. 6.

52

employment. Likewise, if the majority opinion is correct that the Fal-Rig 85 is a vessel, then Demette would not be entitled to compensation benefits indirectly by way of § 1333(b) of OCSLA because the Fal-Rig 85 would not be a situs to which § 1333(b) could have extended those compensation benefits. In short, just as I believe that the Fal-Rig 85 cannot be a vessel and an OCSLA situs at the same time, I believe an injured employee cannot be an offshore oil production worker under § 1333(b) and a maritime worker under § 902(3) of the LHWCA at the same time. On the other hand, if I am correct that when it is jacked up and driving casing into the seabed, the Fal-Rig 85 is not a vessel but an OCSLA situs, then Demette is an oil field worker right where he should be on an OCSLA situs when he is injured and, therefore, is entitled to compensation benefits under § 1333(b). Of course, this discussion about compensation benefits is somewhat academic because Demette settled all of his personal injury claims and whether or not he received the compensation benefits he should have gotten is not an issue before us on appeal.

But the same conundrum arises in analyzing the applicability of § 905(c). A full understanding of the relevance of § 905(c) is much clearer when you look at the legislative history of that provision. As indicated earlier in this dissent, the first statutory iteration of the provisions which ultimately became § 905(c) was in Senate Bill 38 which used the term "third party" in place of the term "vessel" in identifying the negligent tortfeasor

and in identifying the indemnitee of the indemnity agreement referred to therein.[61] Likewise, Senate Bill 38 had an express provision contemplating that this new language would preempt and override "any otherwise applicable state law." The House of Representatives was not agreeable to this change, and the Conference Committee eliminated the idea of preemption of state law altogether and inserted the word "vessel" in place of the words "third party." It is uncontroverted that Demette's injury occurred on the Fal-Rig 85, and there is nothing in the briefs or record excerpts to indicate that any other tug boat, crew boat, supply boat, barge, or other water craft was involved and could be the source of a "vessel negligence" claim. Therefore, if the Fal-Rig 85 in its jacked-up position is not a vessel (as I have argued earlier in this dissent), then there is no vessel negligence upon which Demette (the injured worker) could have sued and no vessel to be sued as defendant. If, on the other hand, the majority is right and the jacked-up Fal-Rig 85 is actually a vessel, then, because he

---

[61] An earlier iteration of the amendment was proposed by the International Association of Drilling Contractors ("IADC") during oversight hearings on the LHWCA in 1978. *Oversight Hearings on the Longshoremen's and Harbor Workers' Compensation Act Before the House Subcommittee on Compensation, Health and Safety, Committee on Education and* Labor, 95th Cong. (May 3, 1978) (statement of Jon Bednerik, Director, Government Affairs, IADC). It is interesting to note that in this early version proposed by the IADC, the term "third party" is used instead of "vessel" and this version also makes no mention of state law preemption. *Id*. The IADC version also creates a definition for a "Marine Petroleum Worker" and makes the amendment only applicable to such workers. *Id*. This definition never made it into the proposed amendments of 1984.

54

is a member of the crew of the vessel, Demette (the injured worker) loses his status as an employee entitled to compensation under § 1333(b), which is an essential condition to the applicability of § 905(c).

## Conclusion

I recognize, of course, that no single panel of our Court can overrule any prior panel decisions and that the changes and reconsiderations that I suggest herein can only be effected by an en banc reconsideration by our Court. In my view, that is precisely what we should do, and I have written at length in this dissent in order to put the parties to this appeal, the amicus in this appeal, and other interested agencies on notice that I will call for a ballot for en banc reconsideration, if strong suggestions for such course of action from the parties and other interests are forthcoming. In my opinion, the seabed of the Outer Continental Shelf adjacent to the States of Texas, Louisiana, and Mississippi contains the largest volume of both discovered and undiscovered oil and gas resources of all of the areas of the Outer Continental Shelf. It is also my opinion that the largest number of workers involved in the development of these oil and gas resources on the Outer Continental Shelf come from the States of Texas, Louisiana, and Mississippi and that most of the operators, contractors, and subcontractors who engage in the business of

drilling and producing oil and gas from the Outer Continental Shelf are either headquartered in or have major facilities in the States of Texas, Louisiana, and Mississippi. We are also blessed to have within the States of Texas, Louisiana, and Mississippi an enormous concentration of legal talent (private practitioners, corporate counsel, and law school professors) who are familiar with (1) the history of the development of the oil and gas resources on the Outer Continental Shelf, (2) the statutory enactments by Congress, (3) the Supreme Court decisions interpreting the statutes, (4) the statutes and interests of the adjacent states, and (5) that historic, traditional, judge-made body of amorphous law affectionately known as "admiralty and maritime law." An en banc reconsideration of the enigmas raised here in this case, informed by briefs of counsel for the parties and interested amici, would be a first step in bringing greater uniformity and predictability to the law applicable to the development of these increasingly critical natural resources.